STATE OF FLORIDA, ex rel. JOHN HARRIS, et al., *Relators*, v. REDMOND B. GAUTIER, as Mayor of the City of Miami, Florida, et al., *Respondents*:

146 So. 562.

147 So. 240.

En Banc.

Order entered January 25, 1933.

Opinion filed March 25, 1933.

Opinion filed May 5, 1933.

*Shutts & Bowen, Crate D. Bowen* and *Herbert S. Sawyer,* and *Thomson, Wood & Hoffman,* for Relators;

*J. W. Watson, Jr., Mitchell D. Price* and *Charles W. Zaring* and *Wm. B. Farley,* for Respondents.

Order entered January 25, 1933.

PER CURIAM.—This cause coming on to be heard upon the motion of the relators to be permitted to file an amendment to the alternative writ of mandamus, seeking to set up an alleged contract between the relators and divers and sundry bondholders, which motion was filed on December 8, 1932, and the objections of the respondents to the filing of said amendment;

It is hereby considered, ordered and adjudged by the court that the objections of the respondents to the filing of said amendment be and the same are hereby overruled, and the motion of the relators for leave to file said amendment to the alternative writ be and the same is hereby granted and allowed.

It is further ordered and adjudged that the respondents be and they are hereby allowed fifteen days in which to amend their answer, heretofore filed to said writ, as they may be advised.

· Done and ordered this 25th day of January, A. D. 1933.

DAVIS, C. J., and WHITFIELD, TERRELL and BUFORD, J. J., concur.

BROWN, J., dissents.

Opinion filed March 25, 1933.

BROWN, J.—On August 29, 1932, upon petition filed by relators, an alternative writ of mandamus was issued herein to require the officials of the City of Miami to budget, appropriate and levy heavy taxes in the current year to pay past due and maturing bonds and coupons of several issues of bonds of the city. It was alleged that there was past due and unpaid at the beginning of the fiscal year 1932-1933, running from June 1, 1932, to May 21, 1933, on account of

principal and interest on said bonds, the sum of $3,690.50, and that there had matured and would mature during the fiscal year, on account of principal and interest, the additional sum of $2,071,625.00. The respondents filed their answer on Sept. 12th, 1932; the relators interposed a demurrer and motion to strike portions of the answer on Nov. 25, 1932, and the respondents filed a short amendment to their answer on Nov. 29, 1932.

In the view which we take of the case at the present juncture, it is necessary for us to pass upon the several matters set up in the answer by way of defenses going to the merits. We might note in passing that, among other things, the answer alleged that the bonds which the relators claimed to hold were not issued under Chapter 9298 of the Acts of 1923, or any similar statute, but were issued under the charter acts of the City of Miami, and that under such Acts the City is under no duty and has no authority to make any such assessment in any one year upon the property within its limits as is demanded by the alternative writ. While we do not deem it appropriate to now finally decide the question, we might observe that the court is very strongly impressed by the allegations of the answer, and the arguments in respondents' brief with the thought that the applicable statutes in this case only contemplate annual tax levies sufficient to pay the interest on the bonds as the interest becomes due, and also an annual assessment each year sufficient to provide a sinking fund for the purpose of paying the principal of the bonds when they mature; that the statutory requirements are intended to prevent defaults in the periodical and ultimate payments so as to avoid accumulations of indebtedness, and that levies for this purpose may be enforced by timely and appropriate procedure; whereas here the alternative writ commands the levy of taxes in the

current year sufficient to pay all past due and maturing bonds and past due as well as current interest, instead of confining the command to the levy of taxes in the current year sufficient to pay current and maturing interest, and leaving past due and maturing principal and past due interest to be redressed in actions on the contracts, or to be adjusted by refunding bonds authorized by Statute. The petition in this case does not pray for, and the writ does not command, the levy of a tax for sinking fund purposes. There are several other very important questions raised by the answer, such as that the city has already levied as high a tax as, under the facts, the law would compel; but, as we have already observed with regard to the question above briefly alluded to we deem it unnecessary and inappropriate to decide these questions at this point in the proceeding.

At the very threshold of this case, we are confronted with the question as to whether or not these relators have any clear legal right to bring and maintain this action.

In their original petition, and in the alternative writ issued thereon, it was alleged that the relators were the "joint owners and holders" of some of said bonds of each issue described therein. The answer flatly denied this allegation, and averred in effect that the relators were not the owners of the bonds, nor the real parties in interest, but acquired possession of the bonds while acting as agents and employes of the city for the purpose of assembling the bonds in question and exchanging them for refunding bonds which had been printed and executed under statutory authority already secured for which services the relators had been paid by the City considerable sums of money for expenses incurred under the contract of agency. The relators then asked leave to amend paragraph II and XII of the Alterna-

tive Writ, which over respondent's objection, was later granted.

By the amendment to paragraph II of the alternative writ, filed by the relators on Dec. 13th, 1932, it was alleged that "the relators are the joint holders of, and are vested under the terms of a certain deposit agreement as trustees of an express trust, with legal title to, all of the bonds and obligations herein above described, and with all the rights and powers of the owners thereof, with the power to take and institute, prosecute, conduct and otherwise exercise control over, or participate in, or cause to be taken, instituted or prosecuted, or become a party to, any suit, action or other proceeding, legal or otherwise, in the names of the relators themselves, to effect a collection or to compel the levy of a tax to provide funds with which to pay said bonds; all of which more particularly appears from the deposit agreement," a copy of which was attached and made a part of the amendment. Paragraph XII of the writ was also amended, so as to include among other things the allegation that "the relators are the joint owners and holders under the terms of said deposit agreement of some of said bonds of each issue hereinabove described," etc.

On February 2nd, 1933, respondents by leave of the court theretofore granted, filed an amendment to their answer addressed to the foregoing amendment by the relators to the alternative writ, in which *inter alia,* the respondents point out that the deposit agreement above referred to was not legally executed, and was not prepared in accordance with the agreement which had previously been made, as shown by the original answer, between the City and the relators, but was inconsistent therewith, and in many respects not only not contemplated thereby, but antagonistic thereto, as set forth in detail in said amendment to the answer.

Relators, on February 13th, 1933, filed a demurrer to, and a motion to strike certain portions of, the amendment to the answer filed Feb. 2, 1933. The case having already been briefed and argued, counsel for both sides later signified their desire to submit the case as it now stands upon the pleadings and briefs already filed. For reasons which will presently appear, and as the court will only consider such portions of the pleadings as the court deems pertinent and material, it is unnecessary to now specifically rule upon all the various demurrers to, and motions to strike designated portions of the voluminous pleadings.

In order to get a clear understanding of the court's opinion and decision, it will, however, be necessary to summarize some of the allegations of the answer and amendments thereto, but before doing so it might be helpful to first advert to certain former decisions of this court which have a vital bearing upon the question respecting the right of the relators to maintain this action.

Mandamus is an extraordinary remedy, and will not be allowed in cases of doubtful right of relator to demand performance by the respondent of the particular duty alleged. The relator must show not only a duty on the part of the respondent, but also that the relator has a *clear legal right* to enforce the performance of that duty. State v. Gray, 92 Fla. 1123, 111 So. 242; Davis ex rel. v. Crawford, 95 Fla. 438, 116 So. 41, and cases therein cited.

A mere agent of the owner of land cannot maintain in his own name a suit to enjoin the collection of taxes alleged to be illegally imposed thereon. King v. Gwynn, 14 Fla. 32.

Wherever two parties stand in such a relation that, while it continues confidence is naturally reposed by one in the other, and this confidence is abused, or exerted to obtain an advantage at the expense of the confiding party, the party

so availing himself of his position will not be permitted to exercise or retain the advantage thus obtained. Even if the inequity of the plaintiff is insufficient to warrant the cancellation of the contract, yet the plaintiff may be refused its enforcement. The doctrine of clean hands need not be pleaded in order to be available where the evidence discloses its applicability. Dale v. Jennings, 90 Fla. 234, 107 So. 175.

One who assumes the position as agent of the owner for the purpose of paying taxes for the owner cannot while occupying such status allow the property to sell for taxes and acquire a tax deed under a certificate of sale so made. Such deed will not convey a valid title as against the owner. Clark v. Johnson, 91 Fla. 485, 107 So. 636.

The term "fiduciary or confidential relations" is a very broad one, and embraces both technical fiduciary relations and those informal relations which exist wherever one man trusts in or relies upon another. The rule of law prohibiting dual agency, while well settled, is predicated on the fact that the interest of the principals are adverse or in conflict. Unless the principal contract for less, the agent is bound to serve him with all his skill, judgment and discretion. He who undertakes to act for another in any matter of trust or confidence shall not in the same matter act for himself against the interests of one relying upon his integrity. So if an agent, employed to purchase for another, purchases for himself, he will be considered as the trustee of his employer. Quinn v. Phipps, 93 Fla. 805, 113 So. 419.

The agent or servant is guilty of a breach of duty, if, without the knowledge and consent of his master or principal, he engages in a transaction which tends to bring his personal interest into conflict with his obligations as a fiduciary agent. An employe is bound to the exercise of the utmost good faith towards his employer, and while, after his

employment has expired, he may compete in business with his former employer, yet he is precluded from using to his own advantage and to the detriment of his former employer, information or material acquired by him in the course of his employment. During the existence of the agency, all profits made and advantages gained by the agent in the execution of the agency belong to the principal; and it matters not whether such profit or advantage be the result of the performance or of the violation, of the duty of the agent, if it be the fruit of the agency. As a general rule, the duty of an agent to be faithful to his principal does not cease when the employment ends, and it cannot be renounced at will by the termination of the relation. It is as sacred and inviolable after as before the expiration of its term. Connelly Paving Co., v. Special Road & Bridge District, 99 Fla. 456, 126 So. 794.

In connection with the case of King v. Gwynn, above cited, it might be noted that under a very similar contract or deposit agreement, to the one here involved, the U. S. Circuit Court of Appeals, Fifth Circuit, recently held that the bondholders' committee were not the real owners of the bonds or coupons sued on; that they paid no valuable consideration therefor; but that such bonds and coupons were delivered by the bondholders to, and were held by, the members of the committee, not as beneficial owners, but merely and solely for collection purposes; and that in so far as the suit by the bondholders' committee on bonds was for the enforcement of claims upon which the real owners could not have sued in the federal court because the amount of the separate individual claims of such real and beneficial owners was not sufficiently large to come within the amount required to give the federal court jurisdiction, the suit should as to them have been dismissed. Bullard v. City of Cisco, 62 Fed.

(2nd) 313. It would thus appear that if the contract between the bondholders and the committee in this case, by which the members of the committee were made trustees with legal title and given such a broad right to sue as would authorize a suit against the city or its officers, was entered into under such circumstances as to render at least that part of the contract unenforceable as against the city, then the relators composing the committee, not being the real parties in interest would under the provisions of section 4201, C. G. L., have no right to sue the city or its officials on these bonds either directly in their own names alone, or indirectly in a mandamus proceeding brought in the name of the State by them as relators.

The 14th, 15th and 16th paragraphs of the answer read as follows:

"14. Affirmatively answering respondents further say that the relators came into possession of all the bonds now held by them, as alleged in the Alternative Writ of Mandamus, as agents and trustees for The City of Miami, and while acting in the employ of The City of Miami as agents, trustees, and brokers, for the purpose of effecting an exchange of the said bonds for other and new bonds which The City of Miami contemplated floating, and which have already been duly and legally authorized and executed, and which are now ready for delivery; that each and all of the bonds held by the relators, if any, were received by them and are still held by them as agents for The City of Miami, and not in their individual right; and that the relators are neither the owners nor holders or bearers in due course for a valuable consideration; and that the relators are not the real parties in interest.

"15. Further answering respondents say that The City of Miami, in the early part of 1931, realized that owing to

financial conditions and the general depression it would be unable to meet outstanding obligations which had been previously executed by the City of Miami, or by officers purporting to represent The City of Miami; that it thereupon conceived the idea of executing and delivering a refunding bond issue that would take up all bonds which were apparently due and payable and any and all bonds which would become due and payable during the next succeding· ten years; that in order to enable it to carry out its desires it procured the passage of an act of the legislature at the 1931 Session of the Florida Legislature, entitled:

" 'An Act to Authorize The City of Miami to Issue Bonds to Refund Indebtedness and Interest, and to Levy a Tax upon all Taxable Property within said City for the Payment of such Bonds and the Interest thereon, and to Pledge Special Assessments, Tax Sales Certificates, Tax Deeds, and certain Real Estate to such Payment, and to Provide a Depository or Depositories for Money Collected for the payment of such Bonds and Interest by Agreement with such Depository or Depositories and/or the Purchasers of such Bonds, and to Require the Commission of The City of Miami to fix and Adjust the Millage levied for Bond Purposes, and to Repal Inconsistent Laws and Parts thereof';

"that after the passage of said act The City of Miami took the necessary steps to float a new bond issue in the sum of $16,258,000 which said new bonds were authorized and duly validated by the Circuit Court of the Eleventh Judicial Circuit of the State of Florida, and were issued at great expense to the City for the purpose of being exchanged for the bonds now held by relators and divers and sundry bonds now outstanding, unpaid, and, according to their terms, maturing during the next ten years; that The City of Miami

found that, in order to carry out the purpose of making such exchange, it would be necessary to employ brokers or else a committee of brokers who would advertise for and gather together the bonds for the purpose of exchange, and who would have an office or offices in cities situated in the more densely populated parts of the United States; that the City of Miami selected five men, to-wit, the relators herein, to act as their brokers and agents to effect the exchange; that said men were selected because of the fact that they were leading and efficient bond brokers and had been largely influential in selling the bonds previously issued by The City of Miami, which were sought to be recalled and replaced by new bonds; that after the passage of the act of the Legislature as aforesaid and the issuance and validation of the bonds, the City Commission of The City of Miami passed a resolution known as resolution No. 7149, a certified copy of which is hereto attached and marked Respondents' exhibit A; that said resolution provided for the payment of a commission of Ten Dollars ($10.00) upon each $1,000 of bonds exchanged by the committee selected for said purpose, and under said resolution the City agreed to advance moneys for advertising, traveling and office costs, a sum not exceeding $50,000; that a copy of said resolution was furnished to the relators herein; that thereafter on the 16th day of March, 1933, the City Commission of The City of Miami passed another resolution expressing itself as being satisfied with any plan the Bondholders' Committee, consisting of the relators as aforesaid, might work out for immediately printing the Refunding Bond Issue. A certified copy of said resolution is hereto attached and marked Respondents' Exhibit B. Respondents respectfully ask that Respondents' Exhibits A and B, above referred to, be taken and considered as a part of this Answer.

"Respondents further answering say that divers other resolutions were passed for the purpose of carrying into effect a contract made between The City of Miami and the relators herein, but that the two resolutions aforesaid, coupled with the letters hereinafter referred to and the checks hereinafter referred to, are sufficient to establish the confidential relation created and still existing between the relators herein and The City of Miami.

"Respondents further answering say that the Bondholders' Committee, to-wit, the relators herein, who now sue in their individual capacity, accepted the resolution herein first above referred to as a valid and binding contract, organized themselves into a committee, employed Harry A. Dunn as Secretary, and employed Thompson, Wood & Hoffman, of New York City, as counsel, to advise them in connection with their employment; that the City of Miami, in pursuance of this agreement to advance certain expenses which were not to exceed $50,000, paid to the committee composed of the relators herein sums of money aggregating the sum of $18,000; that on the 26th day of January, 1932, the Bondholders' Committee, to-wit, the relators herein, wrote to A. E. Fuller, Director of Finance of The City of Miami, a letter itemizing the expenses which they had to incur or contract and which they expected the City to pay them, aggregating $36,833.09; that among the several items of indebtedness stated in said letter was office furniture and equipment aggregating approximately $1200, stationery amounting to $388.98, and one item of $5500 for attorney's fees, payable to the firm of Thompson, Wood & Hoffman for professional services in the matter of the organization of the Committee, including drafting and revising certain deposit agreements and examination of the proceedings of the City Commission authorizing the issuance of refunding

bonds, and also covering divers and sundry conferences and consultations, etc.; that said bill also included $2,000 paid for personal services of representatives of the Committee and a salary of $750 to the Secretary of the Committee. A copy of said letter is hereto attached marked Respondents' Exhibit C, but the original of said letter will be produced in court, it being the desire of the respondents that a copy shall be substituted in lieu of the original because said letter will be needed in other litigation pending.

"Respondents further answering say that The City of Miami made payments upon said account as aforesaid aggregating $18,000; that one of said payments was made by check dated February 4, 1932, in the sum of $10,000, and another by a check dated April 9, 1932, in the sum of $3,000, and another by a check dated May 20, 1932, in the sum of $2,000, and still another by a check dated June 2, 1932, in the sum of $3,000. Photographic copies of said checks are hereto attached, marked Respondents' Exhibit D, the four checks being considered as one exhibit. The originals of said checks will be produced and presented to the Court, the copies being attached in lieu of the originals because of the fact that the originals will be needed in other litigation.

"Respondents further answering say that the relators herein undertook to act as a Bondholders' Refunding Committee under the title of 'City of Miami, Florida, Bondholders' Refunding Committee,' and held themselves out to the world as representing The City of Miami in making an exchange of the new bonds for the old, and wrote divers and sundry letters to The City of Miami upon stationery entitled 'City of Miami Bondholders' Refunding Committee,' then giving the names of the respective members of the committee, to-wit, the names of each of the relators herein, and also showing the name of the Secretary of the

committee, to-wit, Harry A. Dunn, and the name of the General Counsel of the Committee, to-wit, Thompson, Wood & Hoffman of New York City. A photostatic copy of one of said letters, to-wit, a letter dated February 12, 1932, acknowledging the receipt of the $10,000 payment is hereto attached and marked Respondents' Exhibit E, a copy being attached hereto instead of the original, but the original, being produced in court and tendered to the Court for consideration, such original being required by the City for use in other cases.

"Respondents further answering· say that the relators herein, acting for the City of Miami and as agents for The City of Miami, to-wit, as brokers employed to effect an exchange of old bonds for new for and on behalf of The City of Miami, on or about the 24th day of December, 1931, caused a notice to be published in divers and sundry newspapers in the State of Florida and in the United States of America, a true and correct copy of which is hereto attached and marked Respondents' Exhibit F, and asked to be taken and conisldered as a part hereof; that of the $36,000· bill which has been charged against the City of Miami for services rendered by said committee, approximately $20,700 was for advertising and publishing the notice aforesaid, together with an additional notice which will also be presented to the Court in the event a copy thereof can be obtained; that by reason of the publication of said notices as aforesaid and the publication given by the said committee in their desire to make an exchange of bonds, the relators herein, while acting as agents of The·City of Miami, received a large number of bonds, the exact number of which is to respondents unknown, but which respondents are informed by one of the members of the committee to be in the sum of approximately $6,500.000.

"Respondents further answering say that the relators have taken advantage of the position of trust and the moneys which have been advanced by The City of Miami to assemble and accumulate said bonds, and are now seeking to prosecute an action against The City of Miami based upon the bonds which they received in their capacity as agents for the City; that respondents further say that said bonds are owned by divers and sundry persons, firms and corporations throughout the United States; that the bonds held by the relators were delivered to the relators herein by said persons, firms, and corporations for the purpose of effecting an exchange of bonds, and not for the purpose of annoying and vexing The City of Miami with useless litigation.

"15.  Respondents further answering say that the relation of principal and agent between the relators and The City of Miami has never been terminated; that the contract has never been cancelled; that the moneys advanced by The City of Miami to relators has never been refunded; and that the relators are still acting in a fiduciary capacity as agents and employees of The City of Miami, and are still using furniture, equipment, and stationery purchased with moneys advanced by The City of Miami in their attempt to enforce the payment of the indebtedness apparently evidenced by the several bonds which they now claim to own and hold; that the relators herein would not have acquired said bonds and could not possibly have come into possession of said bonds had it not been for the trust relationship which was created under the resolutions, letters and contracts, as aforesaid, between The City of Miami and the relators; that the relators would not now be in possession of the information upon which their action is based had it not been for the confidential relation that was established between The City of Miami and the relators; that the trust relationship

between The City of Miami and the relators was in full force and effect at the time they acquired each and every bond held by them and at the time the mandamus suit was instituted to which this Answer is filed; and that the relators are now seeking to take advantage of the confidence and trust placed in them by The City of Miami and the respondents herein, and are now seeking to profit by reason of the fact that they obtained possession of said bonds as agents of The City of Miami, by reason of advertising published by them which was paid for by The City of Miami, by reason of being able to use the name of The City of Miami in their advertising, and by reason of the fact that they held themselves out to the world as agents of The City of Miami working to consummate a refunding of the alleged indebtedness of The City of Miami; and that the relators herein have no right or lawful authority to maintain their action, and are not the real parties at interest in these proceedings, and have not been authorized by the persons, firms, and corporations owning the bonds described in the Alternative Writ of Mandamus to abandon their original purpose of trying to effect an exchange of bonds and to institute a suit which would subject The City of Miami to great inconvenience, hardship, and financial embarrassment."

Relators contend by their demurrer and brief in support thereof, that the allegations of the answer and supporting exhibits are not sufficient to show the relation of the principal and agent between the City of Miami and the relators. After careful consideration, we cannot agree to this contention. The answer as amended makes out at least a good *prima facie* showing in this respect, and the demurrer questioning its sufficiency in that regard must be overruled.

The relators in their petition and alternative writ assert that they are "jointly the bearers and owners" of the bonds

described therein. The respondents in their answer to this allegation say that: "These respondents * * * positively deny that the relators are jointly the bearers and owners of said bonds or any of them." This tendered a direct issue of fact. The answer also uses the following language: "the relators are neither the owners, nor holders nor bearers in due course for valuable consideration, and the relators are not the real parties in interest."

The relators in their amendment to their writ, have departed from the allegation in the original alternative writ of mandamus. They filed the suit alleging that they were jointly the owners and holders of said bonds. Following their amendment to the writ, they now contend that "the bondholders' committee is acting as the trustee for the bondholders with legal title and with full right to maintain this action." There was no allegation in the original alternative writ of mandamus alleging such a trust relationship. The relators sued orginally as absolute owners and holders of the bonds. By adding this amendment, in substance and effect the relators in one portion of their alternative wit sue in their individual capacities, and in another portion thereof sue in their capacities as trustees holding the legal title with power to sue. Furthermore, we do not see how the relators could have legally renounced their agency for the City, if indeed they ever openly and expressly renounced it, so as to justify them in taking an antagonistic attitude, without first placing the City in *statu quo ante* by returning to the City the sum of $18,000, which had been advanced to them by the City to pay the expenses for assembling these bonds and securing their exchange for bonds of the sixteen million dollar refunding issue.

It might be noted also that the answer alleges that the

advertisement which was issued by the relators and published under their direction, contained the following clause:

"Expenses of the Committee; The City of Miami is anxious to preserve its high credit standing and desirous of having its obligations restored as eligible investments for savings banks in the States of New York and Massachusetts, and has received the sanction of the State Legislature to pay the sum of 1 per cent. of the par value of bonds refunded amounting to approximately $160,000 for such refunding, expecting such fund to completely defray all expenses incident thereto, and obviate any expense to the bondholder whose cooperation it appreciates and solicits."

The answer further alleges that the relators began acting under the assumption that all expenses and the entire compensation of the committee would be paid by the City of Miami, but that when they had a contract prepared by their own attorneys in the City of New York, they provided that the bondholders themselves should be liable for all expenses and charges, and yet proceeded to send a bill for more than $5,000 to the City of Miami for the preparation of said contract.

Counsel for relators contend that this contract must be examined and considered in order to determine whether or not the relation of principal and agent existed between the relators and the respondents. It must be noted that this contract, purporting to be drawn between the relators and the prospective bondholders, was drawn after the contract was made between the relators and the City; that the City of Miami was never a party to the contract which was drawn by the relator's attorneys and printed at their request and charged to the City of Miami; that in fact, according to the amended answer of respondents, the City expressly repudiated the printed contract when brought to its attention

as not being in conformity with the agency which had been created between the City of Miami and the relators.

Relators also contend that the City's action in subsequently voting a tax for the year 1932-33 of only the insufficient amount of twenty mills on the dollar for debt service constituted such bad faith on the part of the City that it warranted the relators in repudiating their contract; in other words, that the contract has been rescinded by them for just cause. We do not think this contention is supported by the pleadings. Furthermore, the answer shows that the relators did not return the $18,000 which had been received by them from the City, and that they are still using the furniture and the stationery and the fruits of the advertisement paid for by the City of Miami, and the respondents contend, and we think justly, that the contract of agency between the City and the relators having been established, could not be repudiated and the relators metamorphosed from agents into antagonists, even if there had been some cause for repudiating the contract, unless the relators had first given due notice to and placed the City in its former position and returned the consideration which they had received from the City. See Black on Rescission of Contracts, Vol. 2, paragraph 617.

Respondents further contend that the City of Miami has never been advised by the relators that they desired to rescind the agency contract, nor have they refunded or offered to refund any portion of the moneys received from the City, but they seek to profit by the moneys expended by the City by retaining the six and a half million of bonds which were accumulated under the agency agreement and retaining the benefit of the advertising purchased at the expense of the City, and that the first knowledge that the City of Miami had of any attempt to rescind on the behalf

of the relators was by the service upon it of the alternative writ of mandamus.

Nor can we assent to the contention of the relators that there was no contract of agency, either express or implied, between the City of Miami and the relators, under the allegations of the answer. The answer alleges that the relators accepted the employment and undertook to act as a bondholders' refunding committee under the title "City of Miami, Florida, Bondholders' Refunding Committee," and held themselves out to the world as representing the City of Miami in making an exchange of the new refunding bonds for the old, the City agreeing to pay them $10.00 for every thousand dollar bond exchanged, that is, one per cent. of the par value of each bond exchanged. But counsel for relators contend that the burden of proving these allegations is on the respondents. This would be true if the relators had joined issue on the answer of the respondents, or had filed a replication thereto, but they have demurred to the answer and by their demurrer have, at last for the purpose of obtaining a ruling on the demurrer, admitted the truth of the allegations therein contained. Therefore the question of the burden of proof is not yet an issue before this court.

The law exacts a high standard of loyalty on the part of the agent toward his principal, Mechem on Agency, 2nd ed., Sec. 1188. Indeed it is a fiduciary relationship. 2 C. J. 425. The agent cannot act in antagonism to the interests of his employer. He cannot acquire any private interest of his own in opposition to that of his principal. 21 R. C. L. 825. Nor can he act for another whose interest is adverse to that of his principal. Our own above cited decisions strongly support this doctrine. In 21 R. C. L. 827, it is said: "In law as in morals, it may be stated that, as a general principle, no servant can serve two masters, for either he will hate the

one and love the other or else he will hold to the one and despise the other. Luke XVI, 23. Unless the principal contracts for less, the agent is bound to serve him with all of his skill, judgment and discretion. The agent cannot divide his duty and give part to another." But, the same authority adds, at the end of the same paragraph: "The validity, however, of contracts of double agency seems now to be well established, where the principals are fully advised and consent to the employment." It should be noted that while the arrangement between the City and these bond brokers, constituting the "City of Miami, Fla., Bondholders' Committee," case, as set forth in the answer, may have implied a consent for the committee to also act for and as the agent of the bondholders, to a limited extent, in securing for them an exchange of their old bonds for the new, this did not imply any consent on the part of the City for the Committee to secure from such bondholders' title absolute or in trust in themselves with the right to sue the City. And the answer denies that the City ever ratified or confirmed such action. It is hardly conceivable that the City would have agreed to pay the committee's expenses in assembling the bonds and a commission of one per cent. on all bonds exchanged if the City had had the slightest idea that the Committee would secure a contract from such bondholders which would give the Committee power to use the very bonds thus assembled for the purpose of suing the City in any manner, much less the attempting by mandamus to compel the City to impose an eighty mill tax levy in the current year upon all the property located within its boundaries.

Relators cite 2 C. J. 542 as authority for the proposition that an agent has the power "to put an end to the agency, and may at his will and pleasure, upon reasonable notice, renounce the power conferred upon him by his principal." But the same text writer also says:

"Although he has the power, it by no means follows that the agent has the right, to renounce the agency at his pleasure. Where the agency is one at will, as where no time is fixed for its duration, so far as it is executory the agent may abandon or renounce it at any time without committing any breach of the contract and without incurring any liability for damages, and unless he has entered upon performance of his undertaking in which event he cannot withdraw therefrom wantonly and without cause without rendering himself responsible to the principal for any loss that he may sustain therefrom; to avoid this liability the agent must act in good faith, and give the principal reasonable notice of the intended abandonment, so that the latter may attend to the business himself, or appoint a new agent to attend to it, or otherwise avoid loss from the renunciation of the agency; and furthermore if the agent fails to notify the principal of his objection to a matter relied on as cause for renunciation he may thereby waive his right to renounce for that cause. Where on the other hand, an agency is not one at will but is for a definite time, and the agent renounces it without sufficient cause before the expiration of such time, he is liable to the principal for any loss thereby sustained, unless the contract, although for a specified time, leaves the agent free to act or not as he will. So also, if the agency is founded upon a valuable consideration it cannot be terminated by the agent without subjecting him to a liability of any damages the principal may sustain thereby." 2 C. J. 542.

"But in order to relieve the agent from the duties and obligations which he has assumed as such, his renunciation must be made known to the principal, as an undisclosed purpose to renounce is without effect." 2 C. J. 543.

And farther on in the same work it is said that, "on termination of the agent's authority, he may be required to

return any money or property received by him from his principal for the purposes of this agency.

So it appears from the allegation of the answer that the relators, instead of representing the city's interests in placing the issue of refunding bonds for an agreed conpensation, as was contemplated by the arrangement between them and the City, come into this Court claiming that they are the owners of certain of the past due and maturing bonds, or, as claimed by their amendment, the trustees of the bondholders, with legal tltle to the bonds, and power to sue, under a contract alleged to have been secured by them from the bondholders, while according to the answer they were still assuming to act as agents for the City, and, ignoring the refunding bonds, and their duty to the City and without reimbursing the City the $18,000, already paid them, seek to enforce by mandamus against the city's officers the levy of an eighty mill tax in the current year to pay all past due bonds and interest, and all that will become due during the year. That it appears from the facts alleged in the answer that the relators do not come into court with that clear legal right to sue which is a prime prerequisite in mandamus proceedings. The contract or deposit agreement set forth in the amended writ, in so far as it purports to give them the right or power to sue the city or its governing officers on the bonds in question, was without legal effect so far as the City of Miami and its officials are concerned. It follows that, on the facts alleged in the amended answer, which facts, on hearing on demurrer, must be deemed to be true, these relators have no clear right to prosecute this suit.

The motion to strike and demurrer of the relators, in so far as the same are addressed to or affect that portion of the original and amended answer hereinabove discussed, are hereby respectively denied and overruled. Those portions

of the answer thus attached tender a legitimate and vital issue of fact which cannot be ignored.

If the relators have no right to maintain this suit, it would be unneccessary to pass upon the other questions raised by the pleadings. We think this question should be finally disposed of first. The relators will therefore be allowed to file such a replication as they may be advised to that portion of the answer as amended, above discussed, within fifteen days, and upon failure so to do, the alternative writ as amended will be quashed.

DAVIS, C. J., and WHITFIELD, TERRELL, and BUFORD, J. J., concur.

Opinion filed May 5, 1933.

PER CURIAM.—Since the opinion and decision of this Court in the above cause, which was handed down on 25th day of March, 1933, relators have filed a reply to the answer of the respondent, the first paragraph of which reads as follows:

"Relators deny that they came into possession of any of the bonds described in the petition filed herein as agents or trustees for the City of Miami, or as representatives in any capacity whatever of the City of Miami, and deny that they acquire such bonds while acting in the employ of the City of Miami as agents, trustees or brokers or in any capacity whatever, and further deny that any of said bonds were received by them and are now held or ever were held by them as agents for the City of Miami, and relators allege that they are the joint owners and holders of each and every bond and coupon described in the petition filed herein and that they came into possession of said bonds and acquired them as such joint owners wholly independently of the City of Miami and the respondents herein, and relators now hold and

possess all of said bonds as joint owners acting in the capacity of trustees for the benefit of the individuals and parties who transferred such bonds to the relators under the terms of the Deposit Agreement dated December 24, 1931, heretofore filed in this action as relators' Exhibit A-1."

The third paragraph of said replication says:

"Relators deny that they were employed or selected by the City of Miami to serve as brokers or agents for the City of Miami for the purpose of effecting an exchange of such Refunding Bonds for outstanding bonds of the City, or for any purpose whatever."

The relators then proceed at considerable length to make a number of allegations, more or less evidentiary in their character, in support of the general allegations above quoted.

To this replication of the relators the respondents have filed a demurrer, most of the grounds of which are addressed to the evidentiary allegations of the replication. Even if some of the grounds of the demurrer are well taken, a matter which we do not decide, the general traverse of those portions of the answer relating to the question of agency would stand, and thus a material issue of fact would inevitably result on this question, which question was discussed in our previous opinion as going to the right of the relators to maintain this action. It also appears quite probable that if this question were out of the way, other issues of fact would arise between the parties as to other portions of the answer which were not discussed in our previous opinion.

While this Court has concurrent jurisdiction with the Circuit Court in actions of mandamus, we have not in this Court those facilities for the taking of testimony and the determination of disputed material questions of fact which are possessed by the Circuit Court. We therefore deem it both expedient and proper in this case, as we have done in

other cases, to dismiss this cause without prejudice to the right of the relators to pursue their remedy in the Circuit Court. It is so ordered.

Dismissed without prejudice.

DAVIS, C. J., and WHITFIELD, ELLIS, TERRELL, BROWN and BUFORD, J. J., concur.