**WOODWARD IRON COMPANY,**
Plaintiff,

v.

George D. PATTERSON, District Director of Internal Revenue, Defendant.

Civ. A. No. 8494.

United States District Court
N. D. Alabama, S. D.

May 11, 1959.

Cabaniss & Johnston and Paul Johnston and David R. Baker, Birmingham, Ala., and Cleary, Gottlieb, Friendly & Hamilton, and George E. Cleary, New York City, for plaintiff.

W. L. Longshore, U. S. Atty., and M. L. Tanner, Asst. U. S. Atty., Birmingham, Ala., and James P. Garland, Charles Mehaffy and Peter J. Donahue, Attorneys, Department of Justice, Washington, D. C., for defendant.

LYNNE, Chief Judge.

After consideration of the pleadings, stipulation of the parties and the evidence adduced upon the trial of this cause, the Court makes and enters the following findings of fact, conclusions of law and judgment:

### Findings of Fact
### Jurisdiction, Parties
### Assessment and Collection of Taxes

1. Plaintiff is a Delaware corporation whose principal place of business is at Woodward, Jefferson County, Alabama.

2. The defendant, George D. Patterson, is District Director of Internal Revenue for the District of Alabama. The said defendant is a resident and inhabitant of Jefferson County, Alabama, within the Southern Division of the Northern District of Alabama.

3. The plaintiff throughout the period here involved maintained its books and accounts and reported its income, for United States income and excess profits tax purposes upon the accrual basis, and has established a taxable year ending on December 31. Plaintiff duly filed (a) with the then Collector of Internal Revenue for the District of Alabama its income and excess profits tax returns for the calendar year 1951 and (b) with the defendant, its income and excess profits tax returns for the calendar years 1952 and 1953, and duly paid to said Collector and to said Director the following amounts respectively on account of the plaintiff's income and excess profits tax liabilities disclosed on said returns, viz.:

| Taxable year | Amount |
| --- | --- |
| 1951 | $6,720,247.76 |
| 1952 | 2,897,984.01 |
| 1953 | 3,213,296.58 |

4. Thereafter, the Commissioner of Internal Revenue notified plaintiff that deficiencies in plaintiff's income and excess profits tax liability had been determined for the years 1951, 1952 and 1953. In accordance with such determination the Commissioner of Internal Revenue assessed, and plaintiff duly paid to the defendant Patterson, District Director of

Internal Revenue for the District of Alabama, additional income and excess profits taxes, with interest thereon, in the amounts set out below, viz.:

| Year | Income and Excess Profits Tax | Interest | Total |
|------|------|------|------|
| 1951 | $ 621,039.07 | $152,009.94 | $ 773,049.01 |
| 1952 | 698,089.23 | 128,983.94 | 827,073.17 |
| 1953 | 922,533.54 | 115,101.85 | 1,037,635.39 |
| Totals | $2,241,661.84 | $396,095.73 | $2,637,757.57 |

5. Said additional income and excess profits taxes arise out of adjustments made by the Commissioner in the method employed by plaintiff in computing the deduction for percentage depletion of its coal and iron ore properties.

6. In filing its tax returns for the year 1951, plaintiff computed the gross income from its coal mining properties and the percentage depletion deduction allowable with respect thereto under I.R. C. (1939) Sections 23(m) and 114(b)(4) 26 U.S.C.A. §§ 23(m), 114(b)(4), on the assumption (a) that the portion of Sec. 29.23(m)–1(e)(3) of Reg. 111 which measures the gross income from mining by the representative market or field price of a mineral product of like kind and grade as taxpayer's mineral product validly applied to the determination of plaintiff's depletion base (hereinafter sometimes referred to as the "market price" part of the Regulation) and (b) that there were in fact representative market or field prices for coking coal of like kind and grade as the coking coals produced from taxpayer's Mulga and Dolomite mines. The coal prices assumed by plaintiff to be applicable and used by it in filing its income and excess profits tax returns for 1951 resulted in a deduction in the amount of $194,428.07 for percentage depletion of coal properties. In the examination and audit by the Commissioner of Internal Revenue of plaintiff's return for 1951, such deduction was reduced to the sum of $75,119.-44 by reason of the lower representative market prices which the Commissioner of Internal Revenue held were applicable to plaintiff's Mulga and Dolomite coking coal.

7. In filing its tax returns for the calendar years 1952 and 1953 the plaintiff used the so-called "proportionate profits" method provided by Sec. 29.23 (m)–1(e)(3) of Reg. 118 in computing its deduction for percentage depletion of coal for said years. The Commissioner, in auditing said returns, determined that the aforementioned market price portion of the Regulation validly applied to determination of plaintiff's depletion base during said years; also that there were in fact during such years representative market or field prices applicable to coal which was of like kind and grade as plaintiff's Pratt seam coal produced from its Mulga and Dolomite mines. The actual costs per ton incurred by the taxpayer during the period 1952-3 in producing its washed Pratt seam coal from both its Dolomite and Mulga mines exceeded the representative market or field prices per ton therefor, as determined by the Commissioner. As a result of the application of the statutory limitation that the percentage depletion allowance shall not exceed 50% of the net income of plaintiff from the property, plaintiff received no allowance for percentage depletion on coal during such years.

Filing and Disallowance of Claims.

8. On April 2, 1954, plaintiff duly filed in the office of the District Director of Internal Revenue for the District of Alabama, a claim for refund for the year 1951 claiming a refund of $182,069.91 which was based on an issue not involved in the subject proceeding. On April 26, 1956, plaintiff duly filed in the office of said District Director an amended claim for refund for the year 1951 claiming a refund of $1,259,051.31 and separate refund claims for the years 1952 and 1953 in the amounts of $823,073.17 and $1,037,851.18, respectively. Said claims for refund were based on the ground that the allowances by the Commissioner of Internal Revenue for depletion of coal mining properties and iron ore properties were insufficient. On July 31, 1956, plaintiff duly filed in the office of said District Director a second amended claim for refund for the year 1951 in the amount of $1,259,051.31, and separate amended claims for refund for the years 1952 and 1953 in the amount of $822,413.66 and $1,037,851.18, respectively. Said amended claims for refund restated, amplified and clarified the grounds for its claim that the allowances made by the Commissioner of Internal Revenue for depletion of coal mining properties and iron ore properties for the taxable years 1951, 1952 and 1953 were insufficient.

9. All of said claims for refund were thereafter, in the manner provided by law, duly disallowed by the defendant.

10. Plaintiff has complied with all conditions precedent to the maintenance of this suit which are required by law or applicable regulations. The several claims for refund filed by plaintiff and described above set forth each ground for refund relied upon in plaintiff's Complaint as amended in sufficient detail to apprise the Commissioner of Internal Revenue of the exact grounds of said claims and the reasons for the allowance thereof.

Summary of Plaintiff's Facilities and Business.

11. During the calendar years 1951, 1952 and 1953, and for many years prior thereto, plaintiff was engaged in integrated operations for the production and sale of merchant pig iron. During the period 1951–1953 plaintiff's operating properties consisted, *inter alia*, of the following:

(a) A furnace plant including four [1] blast furnaces with an annual rated capacity of 772,632 net tons of pig iron, slag granulating equipment, steam and electric generating facilities and repair shops.

(b) A coke oven plant, located within one mile of the blast furnace plant, consisting of 256 by-product coke ovens, coke screening, coal chemical recovery equipment and repair shops.

(c) A coal washery and coal handling facilities.

(d) Two coal mines with an annual capacity of 1,200,000 net tons of washed coal; namely, the Mulga and Dolomite mines, both operating on the Pratt coal seam, and located 8.5 and 4.6 miles, respectively, from plaintiff's blast furnace plant.

(e) Three red ore mines all located within about five miles of the blast furnace plant; namely, the Red Ore, Pyne and Songo mines.

(f) A plant facility railroad connecting all operations, consisting of 52 miles of track and appropriate rolling stock and equipment.

12. Plaintiff did not during the years 1951, 1952 and 1953, sell to others any of the Pratt seam coal produced by it. All such coal, after being mined, was processed through a Bradford breaker which removed the large rock and sized the coal. The coal was then transported by plaintiff on its own railroad to the coal washer located at plaintiff's coke oven plant where such coal (excepting Mulga fines) was washed, dried and

---

[1]. No. 4 blast furnace was completed, and blown in on October 30, 1951.

pulverized and then manufactured into blast furnace coke. During 1951, 1952, and 1953, plaintiff produced run-of-mine coal from its Dolomite and Mulga mines, charged Mulga fines to the coke ovens, and sent coal to the washer which was converted to washed coal in the amounts set forth in the tabulation below:

| Year | 1951 | 1952 | 1953 | Total |
|---|---|---|---|---|
| Run-of-mine coal produced tons | 1,458,393 | 1,206,258 | 1,441,048 | 4,105,699 |
| Mulga Fines – tons (included in R/M coal above) | 194,339 | 132,345 | 112,284 | 438,968 |
| Run-of-mine coal sent to washer – tons | 1,215,132 | 1,077,631 | 1,330,244 | 3,623,007 |
| After conversion to washed coal-tons | 866,667 | 779,906 | 966,061 | 2,612,634 |

13. Plaintiff's sales of blast furnace coke during each of the taxable years involved and the percentage of such sales to the total amount of blast furnace coke produced by plaintiff in its coking operations for each year are as follows: [2]

| | Plaintiff's Coke | | | Coke sold to others | |
|---|---|---|---|---|---|
| | Produced | Utilized | | | |
| Year | Tons | Tons | % | Tons | % |
| 1951 | 832,430 | 679,330 | 81.61 | 100,606 | 12.09 |
| 1952 | 748,459 | 724,357 | 96.78 | 2,072 | .28 |
| 1953 | 756,301 | 652,519 | 86.28 | 31,628 | 4.18 |
| Average | 779,063 | 685,735 | 88.02 | 44,769 | 5.75 |

14. Certain coal chemicals and coke breeze resulted incidentally from the production of coke while the blast furnace operation resulted in slag as incident to its primary product—pig iron. These residual or by-product chemicals

2. Plaintiff purchased coke amounting to 15,907 tons in 1951; 39,903 tons in 1952; and 0 tons in 1953.

or commodities were sold. The amount of the sales in each category for the years 1951, 1952, and 1953 were as follows:

|  | 1951 | | 1952 | | 1953 | |
|---|---|---|---|---|---|---|
|  | % | Amount | % | Amount | % | Amount |
| Pig iron | 82 | $26,871,112 | 89 | $28,339,102 | 85 | $25,782,949 |
| Furnace Coke | 6 | 1,885,872 | — | 39,566 | 2 | 598,220 |
| Nut coke | 1 | 482,215 | — | 60,974 | 1 | 180,575 |
| Slag | 2 | 558,807 | 2 | 488,456 | 2 | 738,514 |
|  | 91 | $29,798,006 | 91 | $28,928,098 | 90 | $27,300,258 |
| By-products: Coal chemicals | 7 | 2,357,588 | 7 | 2,231,136 | 8 | 2,461,786 |
| Coke breeze | 2 | 616,934 | 2 | 589,730 | 2 | 558,113 |
|  | 9 | $ 2,974,522 | 9 | $ 2,820,866 | 10 | $ 3,019,899 |
| Total sales | 100 | $32,772,528 | 100 | $31,748,964 | 100 | $30,320,157 |

Certain technical facts with respect to the production of pig iron in a blast furnace.

1. *The importance of uniformity in the quality of raw materials.* In the production of merchant pig iron Woodward is called upon by its customers to produce 28 different grades of iron to supply their particular requirements. The analysis of these various grades of iron must closely conform to the customer's specifications. There is little market for so-called off-grade or off-analysis iron. The manufacture of grades conforming to customers' specifications requires the substantial elimination of variables in raw materials and operating procedures. The major potential sources of variability in operating a blast furnace with some of the steps taken by Woodward to assure uniformity are noted below.

*Iron ore.* The analysis of iron ore produced from iron ore mines varies through the thickness of the seam and from one end of a particular seam to the other. To control this variability Woodward installed a Heavy Media Plant in 1953 at Pyne Mine, incorporating crushing and screening facilities from the previous operations, effectuating more accurate control of the size of the ore. This installation also eliminated certain variables in the amount of "gangue" material; namely, lime, silica and aluminum, which is not combined with the ore in producing iron.

*Air.* Woodward Iron Company was one of the first iron producers to install air conditioning on its blast furnaces, so that the moisture content of the blast air is held constant.

*Gas.* Woodward was one of the first to install "in wall temperature pyrometers" in order to give the operator a check on the proper distribution of the gases passing through the burden material in the furnace shaft.

These procedures brought about a maximum control of various variables in plaintiff's blast furnace operations.

*Coke.* Coke for the blast furnace must have definite physical and chemical properties which determine whether or not it will work satisfactorily in the furnace. While coke of widely varying chemical and other characteristics is used satisfactorily among the various blast furnaces, the coke going to an individual furnace must be uniform in physical structure, size, strength and chemical composition if efficient operation is to be expected. Adjustments can be made to accommodate a coke of poor but uniform quality, but an efficient competitive operation cannot be achieved without diffi-

culty with a coke of good but varying quality. No changes in the constituent elements contained in plaintiff's coke are made to comply with the various specifications of plaintiff's customers for pig iron. Any changes which are necessary to produce the different types of iron take place in the blast furnace and not in the coke ovens.

The behavior of coke in a blast furnace is not fully predictable from laboratory tests. Coke which is satisfactory in one plant may be quite unsatisfactory in another. However, evaluation in a blast furnace is too difficult and expensive, involving the purchase of some 100,000 tons of coal and the production of thousands of tons of iron before a relevant evaluation can be made, to be used except on coals that have a good chance of coking successfully. Full scale tests in a regular oven are used to give the most comprehensive evaluation possible, short of such long-term blast furnace use, and while not definitive, the coke in actual use possibly being slightly better or much worse than the test would indicate, such oven tests have become progressively more accurate in recent years and are regularly used to determine whether or not a given coal or blend of coals has a good chance of coking successfully. While chemical and physical analyses are not uniformly determinative of the behavior of a coke in a blast furnace, certain facts with respect to the optimum characteristics of metallurgical coke or its constituent coal are generally accepted in the blast furnace industry. One of these criteria, the dry, mineral-matter-free fixed carbon can be computed from a chemical analysis. The following facts are also well established in the industry:

(a) High ash content means less fixed carbon in the coke and more slag volume in the blast furnace, which in turn means more coke per ton of iron and less iron production. The ash content of coke is about 1.35 that of the coal charged to the coke oven.

(b) Each per cent of ash reduction in blast furnace coke will result in an increase from 3 to 6 per cent in iron production. Thus the lower the ash the better.

(c) High sulphur means irregular blast furnace operation, higher slag volume, contamination in the iron, and lower iron production. Coal with as low a sulphur content as possible is therefore desirable.

(d) During the coking process, coals may undergo marked changes in volume. Since expanding coals may exert dangerous pressures against the oven walls and form stickers which are difficult to remove it is generally necessary that such coals be used in blends with contracting coals to form a mixture that is approximately neutral. Mixtures safe when coked for long times at low temperatures may be dangerous at faster coking rates with higher temperatures.

(e) Generally speaking, low-volatile coals expand and thus are blended with high-volatile coals which tend to contract. A coke must be sufficiently strong to resist breakage through handling and during its descent through the furnace. High-volatile coals give a coke a low physical strength, and thus normally must be blended with low-volatile coals.

(f) The quality of blast-furnace coke starts at the mines, and there must be good coking coals to produce good coke.

2. *The function and importance of plaintiff's Pratt seam coal in relation to its manufacturing operations.* In manufacturing coke for consumption in its blast furnaces, the plaintiff customarily mixes its coals from its Dolomite and Mulga mines as received and then washes the mixture, the lower sulphur content of the Dolomite coal offsetting a somewhat higher sulphur content of the Mulga coal. Plaintiff's Pratt seam coal is sometimes supplemented with minor quantities of coal purchased from other sources, although such blending is not necessary to produce the grade of coke

needed by plaintiff in its pig iron business. Of the coal charged to the coke ovens, the coal purchased from others was as follows:

| | | Coal Purchased from Others Charged to Ovens |
| --- | --- | --- |
| Year | Tons | Per cent of Total Actually Charged |
| 1951 | 98,152 | 8.03 |
| 1952 | 80,037 | 7.52 |
| 1953 | 3,471 | .33 |
| 1954 | 0 | .00 |
| 1955 | 139,125 | 11.27 |
| 1956 | 175,702 | 16.37 |

No coal purchased from others was used in the coke ovens during the last 10 months in 1953.

The consistency of the washed coal produced from plaintiff's Dolomite and Mulga mines as to chemical constituents makes a blast furnace coke which is characterized by a high degree of uniformity in chemical analysis and physical properties. An equally uniform and suitable blast furnace coke can be produced from either the Dolomite coal or the Mulga coal since the higher pyritic sulphur content of the Mulga coal can be reduced to permissible limits by the application of standard washing procedures. Plaintiff's Pratt seam coal produced from its Dolomite and Mulga mines, used either in combination or singly, requires no blending with other coking coals to produce a grade of blast furnace coke which is especially suitable for use in plaintiff's blast furnace operations.

It is the prevailing practice in the coke industry to blend several coking coals with different inherent qualities to make a commercial foundry or blast furnace coke, a necessary procedure with the coals generally available, but plaintiff has been able to utilize the coal derived from only one seam in the manufacture of its requirements of blast furnace coke.

Pratt seam coal, such as that produced by the plaintiff from its Mulga and Dolomite mines, could be used without measured blending for the making of metallurgical coke. The plaintiff could and had made satisfactory coke from either its Mulga coal or its Dolomite coal but customarily used such coals as produced without any measured blending, the mixture ordinarily varying from 50–50 to 80% Mulga and 20% Dolomite.

For economic reasons, plaintiff mixes the coals from its Mulga and Dolomite mines to make a commercial blast furnace coke. The Mulga and Dolomite coals, although interchangeable, have different characteristics and were used in a mix during the years in issue and have been used in a mix since prior to 1940. The Woodward Iron Company, although it mixes its two coals, does not use a measured blend.

The primary objective of blending is to produce economically a quality of coke satisfactory for the use intended. It permits the use of coals that have good coking properties but may be otherwise objectionable because of excessive ash, sulphur or phosphorus.

The scientific or measured blending of coal for making coke involves extra expense and the fact that the plaintiff could use coal from its Mulga and Dolomite mines interchangeably and without measured blending made it an economical coal to use and enhanced its value.

Although the plaintiff used only Pratt seam coal, other foundry and blast furnace operators obtained a satisfactory blend with coking coals from seams other than Pratt. The Pratt seam coal and the Mary Lee seam coal were the only Alabama coking coals which could be used without blending to make blast furnace coke.

The DeBardeleben Coal Corporation was engaged in the manufacture of high grade foundry coke. DeBardeleben used a blend of Blue Creek, Black Creek, Pocahontas from West Virginia and Anthrafines in its blend. DeBardellben made a commercial coke without the use of either Mary Lee or Pratt seam coal.

Plaintiff's consolidated cost of production per washed ton of its Dolomite and Mulga coal in the years 1951, 1952 and 1953, in the quantities used was as follows:

|      | Mulga | Dolomite | Consolidated |
|------|-------|----------|--------------|
| 1951 | 5.615 | 8.302    | $6.382       |
| 1952 | 6.003 | 8.348    | 6.648        |
| 1953 | 5.758 | 8.128    | 6.354        |

---

The Tennessee Coal & Iron Company in the first quarter of 1958 produced Pratt seam coals from its Docena, Edgewater and Short Creek mines at a cost of $8.91 per ton and its cost of production of such coal in 1951, 1952 and 1953 was fairly close to that figure. The Tennessee Coal & Iron carbonized about 4,-000,000 tons of coal per year for making blast furnace coke, most of which was produced from its own mines.

Classification of Alabama coals

All of the coal in the Birmingham District is bituminous coal. In accordance with the standard of classification of coals by rank as promulgated in 1937 by the American Society For Testing Materials, which system has been adopted and approved by the Bureau of Mines (Department of Interior), bituminous coals are classifiable as follows:

Bituminous Coal

| Group | Limits of fixed carbon of BTU-Mineral-Matter-free basis |
|-------|--------------------------------------------------------|
| Low volatile | Dry F.C. 78 – 86%<br>Dry V.M. 14 – 22% |
| Medium volatile | Dry F.C. 69 – 78%<br>Dry V.M. 22 – 31% |
| High volatile A | Dry F.C. less than 69%<br>Dry V.M. more than 31%<br>Moist BTU − 14,000 or more |
| High volatile B | Moist BTU: 13,000 – 14,000 |
| High volatile C | Moist BTU: less than 13,000 |

Legend:  FC = fixed carbon
VM = volatile matter
BTU = British thermal units

In the Birmingham District there are only two of the above groups, namely, the medium volatile and the high volatile A coals. There are no low volatile or high volatile B and C coals.

Alabama coking coals differ in their chemical analyses, i.e., the amounts of fixed carbon, volatile matter, sulphur and ash in the coking coal. The physical structure and strength of coke made from Alabama coking coals also varies with the seam of coal being used.

The best coals for coke making fall in the high volatile A, medium volatile and low volatile groups. As a general rule the lower ranking coals, that is, the high volatile coals, yield a relatively weak coke. Also, the low volatile coals expand too much when coked alone to carbonize safely in the coke ovens.

The three groups mentioned are designated by the ASTM system on the basis of dry mineral-matter-free fixed carbon, which ranges from less than 69% in the high volatile A to as high as 86% in the low volatile group.

Alabama coals may also be classified by quality as follows:

(1) A coking coal which is so constituted chemically, petrographically, and physically that it will produce a commercially satisfactory coke when coked under standard coking procedures.

(2) A coal which has certain chemical, physical and petrographic characteristics that when blended with a coking coal such as that described above and/or certain other coking coals will produce a commercially satisfactory coke when coked under standard coking procedures.

(3) A coal which can not be used in making coke due to lack of coking characteristics.

Only a Class (1) coal can be used to make a satisfactory coke by itself. Similarly, only Class (1) and Class (2) Alabama coals can be used in the making of a commercially satisfactory coke. The coal mined from plaintiff's Pratt seam mines qualifies as Class (1). Coal from the Dolomite and Mulga mines is classifiable as medium-volatile bituminous coal. The composition of plaintiff's coal is such that it will form a satisfactory and uniform grade of furnace coke without blending with other coking coals. While plaintiff's Pratt seam coal produces a commercially highly satisfactory coke without measured blending, not all Pratt seam coal is satisfactory in that respect.

Mary Lee seam coal in certain areas is also a medium-volatile coal which qualifies as a Class (1) coal. Coke made from Mary Lee coal will demonstrate higher ash than coke from coal from plaintiff's Pratt seam.

Blue Creek coal is also a medium volatile coal but is not classifiable as a Class (1) coal because it is a highly expanding coal and its use would entail danger to the coke ovens unless used as a relatively small portion (not more than 20%) of a blend with a Class (1) coal. During the years 1951 and 1952, plaintiff charged to its coke ovens the quantities of Blue Creek coal shown by plaintiff's exhibit 35.

The average proximate analysis of coke produced by the Woodward Iron Company during the years in issue was as follows:

| Year | Volatile Matter | Ash | Sulphur | Fixed Carbon |
|------|------|------|------|------|
| 1951 | 1.61 | 9.26 | .98 | 89.15 |
| 1952 | 1.57 | 9.61 | 1.00 | 88.86 |
| 1953 | 1.53 | 9.43 | 1.02 | 89.09 |

The average proximate analysis of blast furnace coke produced in the Unit- ed States during the years in issue was as follows:

| Year | Volatile Matter | Ash | Sulphur | Fixed Carbon |
|------|-----------------|-----|---------|--------------|
| 1951 | .9 | 9.9 | .9 | 89.2 |
| 1952 | .9 | 9.9 | .9 | 89.2 |
| 1953 | .9 | 9.7 | .9 | 89.4 |

———◆———

The average proximate analysis of foundry coke produced in the United States during the years in issue was as follows:

| Year | Volatile Matter | Ash | Sulphur | Fixed Carbon |
|------|-----------------|-----|---------|--------------|
| 1951 | .9 | 8.7 | .6 | 90.4 |
| 1952 | .9 | 8.7 | .6 | 90.4 |
| 1953 | .9 | 8.7 | .6 | 90.4 |

———◆———

Economics of Alabama and American coking coal industry

(a) The demand for coking coal in Alabama as indicated by actual utilization (1951–53)

During the years involved, the total tons of coal actually carbonized in Alabama and the amount carbonized by plaintiff were as follows:

| Year | All companies | Coal carbonized (net tons) Woodward | Woodward % |
|------|---------------|-------------------------------------|------------|
| 1951 | 8,761,759 | 1,170,784 | 13.36% |
| 1952 | 8,280,208 | 1,028,121 | 12.41 |
| 1953 | 9,005,750 | 1,011,436 | 11.23 |

———◆———

Of the total coal actually carbonized, no more than 3.2% came from out-of-state sources. The following relative amounts of coal carbonized thus originated inside Alabama:

| | |
|------|-------|
| 1951 | 97.4% |
| 1952 | 96.8% |
| 1953 | 96.8% |

Tons of coal purchased from outside of Alabama were as follows:

| Year | Tons |
|---|---|
| 1951 | 226,718 |
| 1952 | 263,418 |
| 1953 | 287,037 |

As of January 1, 1953, estimated coal reserves in the United States were as follows:

| Bank | Remaining Reserves* | Recoverable Reserves* |
|---|---|---|
| Bituminous | 1,049,457 | 524,729 |
| Subbituminous | 372,934 | 186,467 |
| Lignite | 463,356 | 231,678 |
| Anthracite and Semi-anthracite | 13,992 | 6,996 |
| | 1,899,739 | 949,870 |

\* Millions of tons.

———◆———

At the present rate of consumption these reserves are expected to last for another 1900 years.

In the United States as a whole, there has been a tendency on the part of iron and steel operators to integrate their coking and steel-making facilities more closely. For example, in the 5-year period from 1932–1936 their plants produced 65% of the total oven coke output; in 1937–1941, 74%; in 1942–1946, 77%; and in 1947–1951, 81%.

### (b) Alabama coking coal available for purchase (1951–53)

The principal known reserves of coals which could be coked for commercial foundry coke or to make blast furnace coke during the period 1947 through 1956 were owned by six captive companies operating in Alabama, namely: United States Steel Corporation (TCI Division), Woodward Iron Company, Republic Steel Corporation, United States Pipe & Foundry Company, Alabama By-Products Corporation and DeBardeleben Coal Corporation. Except for DeBardeleben, the above-mentioned companies utilized all of their own coals to meet their own requirements and did not generally offer such coal for sale to other purchasers.

Therefore, Alabama coal production is also classifiable by the type of operation which produced it; viz., according to coal produced by:

1. Captive operations
2. Controlled operations
3. Commercial operations.

*Captive operation* coal is mined on land owned by the integrated companies, used to meet their own requirements, and not generally offered for sale in a public market.

*Controlled operation* coal is mined under contract or other corporate arrangement which precludes its sale in a public market or otherwise makes it unavailable as an assured or regular source of supply.

*Commercial operation* coal is mined by an operator for sale to others and over the disposition of which the operator retains full control.

Controlled operations exhibit two sorts of control, viz.:

1. Production of coal which is committed to a particular purchaser under long-term contracts which effectively withdraw such production from market availability.

2. Operations by commercial operators on land leased from one of the captive companies. This category includes the great majority of controlled operation coal mined during the years 1951–53. All coal mined from the Blue Creek

seam was mined under lease from U. S. Steel (TCI Division). The same applies to all coal mined from the Pratt seam, which was not mined by the furnace companies. The leases contained divers regulatory and control provisions.

Recoverable bituminous coal reserves in the state of Alabama as of January 1, 1953, were estimated at 32,924,000,000 tons.

There are four coal fields in the State of Alabama. They are Warrior, Cahaba, Coosa and Plateau. Only bituminous coal is found in these fields.

The *Coosa* field produces a high ash and sulphur content coal which precludes its use as a coking coal. State statistics show that no rail connected mines have operated in that field for a number of years.

The *Plateau* field's one rail connected mine operated by the Robbins Coal Company produced unwashed coal from 1951–53 for use in a by-product coke oven which was shipped under contract to Sheffield Steel Division of Armco Steel Company in Texas. Truck mines were also operating in the Underwood seam.

The *Cahaba* field, bounded on the north by Shades Mountain, lies generally south and east of Birmingham. It has been important historically as a producer of domestic coal for which it is well suited, since it is of a high volatile nature, and therefore free burning. Three rail connected mines produced coking coal from the Woodstock seam in this field during the years 1951–53, inclusive. There were also truck mines operating on the Thompson seam, such as the Piper Mine.

The *Warrior* field, lying west, northwest and southwest of Birmingham, covers most of the drainage basin of the Warrior River in Tuscaloosa, Jefferson, Walker, Marion, Cullman, Winston and the southern part of Blount County. The southeast part of the Warrior field, which is adjacent to Birmingham, contains coal which is convertible into a good coke for blast furnace and other metallurgical use. The Warrior field may be classified into four groups of coal beds. These take their name from their principal seams, which are the Pratt, Mary Lee (with the development of its bottom bench, Blue Creek), Brookwood and Black Creek seams.

The captive companies of the Birmingham district have always depended upon coking coal from the Warrior field as the primary ingredient of their blast furnace or foundry coke, 99% of the coal which has been coked in the Birmingham area having emanated from this field. Therefore, these companies have taken care to acquire adequate reserve supplies of this coal for current and future utilization.

During the years 1951–1953 the plaintiff mined coal from the Pratt seam only, which is in the Warrior field. During the years 1951–1952 the plaintiff purchased and used in its coke ovens coal from the Mary Lee, Blue Creek, Black Creek, Pratt and Milldale-Brookwood seams of the Warrior field as well as coal from the Cahaba field.

Insufficiency of available "free" supplies or reserves of coking coal in Alabama to meet the needs of Woodward Iron Company.

If, during the tax years involved, plaintiff had been compelled to look to sources other than its own Pratt seam reserves, it could not have procured its requirements of similar coking coals or acceptable substitute coking coals in the State of Alabama, and would have been required to procure acceptable coking coals from out-of-state sources as an alternative to closing down its coke oven operations.

Cost of replacement of Plaintiff's Pratt Seam Coal from outside Alabama.

While, under the circumstances stated, plaintiff could not have supplied its needs of coking coal from Alabama during 1951–1953, coking coals were available elsewhere in the United States to supply such needs. Harlan County, Kentucky, and certain counties in West Virginia afforded the most accessible out-of-state

market areas for the purchase of acceptable substitute coking coals during that period. The quantity of coking coal required by plaintiff was available from the Pittsburgh Consolidation Coal Company's mines opening on the Elkhorn seam and from producers of so-called Pocahontas coal.

Since Elkhorn coal by itself does not produce a satisfactory furnace coke, it is customarily blended with low volatile Pocahontas coal from West Virginia. To obtain an acceptable substitute coal for its Pratt coal, it would have been necessary for plaintiff to blend Elkhorn (Kentucky) coal with approximately 40% Pocahontas (West Virginia) coal. The price of such acceptable substitute blend to plaintiff is set forth below, viz.:

### Blend of 40% Pocahontas and 60% Elkhorn Coal

| Year | Coal Cost F.O.B. Mines | Freight Cost | Handling Cost and Tonnage Tax | Cost at Plaintiff's Ovens |
|------|------------------------|--------------|-------------------------------|---------------------------|
| 1951 | $5.92 | $4.52 | $.54 | $10.98 |
| 1952 | 5.97 | 4.78 | .54 | 11.29 |
| 1953 | 6.06 | 4.85 | .54 | 11.45 |

### Representative Market Prices

During the year 1951 1,331,477 tons of coking coals were purchased in the Birmingham district at prices ranging from $3.75 per ton to $9.31 per ton.

During the year 1952 1,291,276 tons of coking coals were purchased in the Birmingham district at prices ranging from $4.95 per ton to $9.38 per ton.

During the year 1953 1,307,483 tons of coking coals were purchased in the Birmingham district at prices ranging from $5.26 per ton to $9.56 per ton.

There was during the years in issue in the Birmingham district a representative market or field price for coking coals of like kind and grade as that used by the plaintiff in the manufacture of coke. That price was:

| | |
|------|------------------|
| 1951 | $8.00 per ton |
| 1952 | 7.85 " " |
| 1953 | 8.10 " " |

### Iron Ore Depletion

For the years 1951–1953 the Commissioner of Internal Revenue computed the percentage depletion allowance for the plaintiff's iron ore properties by the proportionate profits method exactly in accordance with applicable Treasury Regulations, as demonstrated by the following example:[3]

3. Of course the other findings of fact and the conclusions of law of the court will substantially affect the precise figures occurring in the computation.

1951

 Sales – Pig Iron and Slag       $27,429,919.77
 Direct Costs of Sales        16,186,767.42

   Gross Profit         $11,243,152.35

 Percentage of Gross Profit to Direct Costs
  (11,243,152.35 ÷ 16,186,767.42) = 69.4589108%

### Iron Ore

| Direct Costs | Direct Costs Plus Proportionate Profits | Gross Income from the Property |
|---|---|---|
| Red Ore | $ 261,825.18 | |
| Proportionate Profits 261,825.18 x 69.4589108% | 181,860.92 | $ 443,686.10 |
| Songo | 1,163,394.38 | |
| Proportionate Profits 1,163,394.38 x 69.4589108% | 808,081.07 | 1,971,475.45 |
| Pyne | 3,772,199.31 | |
| Proportionate Profits 3,772,199.31 x 69.4589108% | 2,620,128.55 | 6,392,327.86 |
| Total Gross Income from Ore Properties | | $ 8,807,489.41 |

Sales       $27,429,919.77
Direct Costs      16,186,367.42
% Direct Costs to Sales
(16,186,767.42 ÷ 27,429,919.77 = 59.0113554%
Iron Ore Costs (3 properties) 5,197,418.87 ÷ 59.0113554% = $8,807,489.41

1952

 Sales – Pig Iron and Slag       $28,827,557.19
 Direct Costs of Sales        21,101,168.84

   Gross Profit         $ 7,726,388.35

 Percentage of Gross Profit to Direct Costs
  (7,726,388.35 ÷ 21,101,168.84) = 36.61592591%

## Iron Ore

| Direct Costs | Direct Costs Plus Proportionate Profits | Gross Income from the Property |
|---|---|---|
| Red Ore | $    473,323.46 | |
| Proportionate Profits 473,323.46 x 36.61592591% | 173,311.77 | $    646,635.23 |
| Songo | 936,333.41 | |
| Proportionate Profits 936,333.41 x 36.61592591% | 342,847.15 | 1,279,180.56 |
| Pyne | 4,204,365.48 | |
| Proportionate Profits 4,204,365.48 x 36.61592591% | 1,539,467.35 | 5,743,832.83 |
| Gross Income from Iron Ore Properties | | $  7,669,648.52 |

Sales                                     $28,827,557.19
Direct Costs                                21,101,168.84
% Direct Costs to Sales
(21,101,168.84 ÷ 28,827,557.19 – 73.19790818%
Iron Ore Costs (3 properties) 5,614,022.35 ÷ 73.19790818% = $7,669,648.62

1953

| | Gross Income from the Property |
|---|---|
| Sales – Pig Iron and Slag | $26,521,463.03 |
| Direct Costs of Sales | 18,258,650.24 |
| Gross Profit | 8,262,812.79 |

Percentage of Gross Profit to Direct Costs
(8,262,812.79 ÷ 18,258,650.24) = 45.25423665%

## Iron Ore

| Direct Costs | Proportionate Profits Direct Costs Plus | Gross Income from the Property. |
|---|---|---|
| Red Ore | $ 573,312.26 | |
| Proportionate Profits 573,312.26 x 45.25423665% | 259,448.09 | $ 832,760.35 |
| Songo | 616,119.68 | |
| Proportionate Profits 616,119.68 x 45.25423665% | 278,820.26 | 894,939.94 |
| Pyne | 4,540,192.76 | |
| Proportionate Profits 4,540,192.76 x 45.25423665% | 2,054,629.57 | 6,594,822.33 |
| Gross Income from Iron Ore Properties | | $ 8,322,522.62 |

Sales     $26,521,463.03
Direct Costs     18,258,650.24
% Direct Costs to Sales
(18,258,650.24 ÷ 26,521,463.03 = 68.8448077%
Iron Ore Costs (3 properties) 5,729,624.70 ÷ 68.8448077% = $8,322,522.62

Under the proportionate profits method of computation of depletion on iron ore properties, there are two activities: first, the ordinary treatment processes of iron ore mining, and, secondly, processing beyond the ordinary treatment processes of iron ore mining. The cost of coal mining is one of the costs beyond the ordinary treatment processes of iron mining. The cost of coal, as part of the cost of producing pig iron, must bear a proportionate part of the profit.

During the years in issue the plaintiff sold various residual products of its operations, such as coke oven by-products (coal chemicals and coke breeze), nut coke, furnace coke and slag. Slag sales are a by-product of pig iron operations. Coke, coal chemicals and breeze resulted from the manufacture of coke and were excluded from iron ore depletion computations. The plaintiff challenges only the exclusion of the by-products, breeze and coal chemicals.

As applied to the facts of this case, there are two generally accepted accounting methods for handling by-product sales, the joint product method and the by-product method. Under the by-product method the gross receipts of the by-product sales are used to reduce the costs of the primary product and no separate costs records are maintained for the by-products. Under the joint products method a separate account is maintained for each of the products and some arbitrary method is used to allocate total costs. The plaintiff uses the by-products method of accounting for handling the sales of the by-products of its coke oven operations. The Commissioner of Internal Revenue computed the plaintiff's percentage depletion by using the joint products method.

Woodward Iron Company's use of the by-products method of accounting in handling the by-products resulted in depletion allowance greater than that determined by the Commissioner. The Commissioner, in using the joint products method, attributed the same rate of profit to the by-products as to all other products.

### Conclusions of Law

1. The court has jurisdiction of this action and of the parties hereto.

2. The issues involve the proper determination of plaintiff's income tax deduction for percentage depletion of its coal and iron ore properties under Sections 23(m) and 114(b)(4) of the Internal Revenue Code of 1939. The Regulations involved are Reg. 111, § 29.23(m)–1(f), applicable to the year 1951, and Reg. 118, § 39.23(m)–1(f), applicable to the years 1952 and 1953. The difference in phraseology between the two regulations is not material to this case.

3. The deduction for percentage depletion of minerals under § 114(b)(4), Int.Rev.Code of 1939, requires the determination of a dollar base against which to apply the applicable percentage; 10% in the case of coal and 15% in the case of iron ore. Section 114(b)(4) does not undertake to provide a specific method or yardstick for determining the amount of the depletion base—i.e., "gross income from mining"—in those cases where the mineral product is not sold in its crude state, or after "ordinary treatment processes" are applied, but where such mineral product is subjected to further processing before sale. In that type of case the Commissioner in his regulation has provided two methods for determining the depletion base, which are explained below, viz.:

(a) Comparing the price of the taxpayer's mineral product with the "representative market or field price" of a mineral product of "like kind and grade" as the taxpayer's mineral product which is sold commercially (herein called the "market-comparison" method); or

(b) Allocating to mining operations the taxpayer's total gross income from the sale of its processed or manufactured products on the basis of the ratio of the direct cost of the mining operations to the total cost of producing such end products (herein called the "proportionate profits" method).

4. With respect to coal depletion, plaintiff contends that it is legally entitled to use the proportionate profits method in computing its gross income from coal mining as opposed to the government's contention that such depletion base is to be determined by reference to the prices at which "like kind and grade" local coals were sold commercially. However, in cases where there existed at the material times involved a representative market or field price of a mineral product of like kind and grade as the mine owner's mineral product—this court has previously held that the terms of the regulation require that the depletion base be determined by the first method; that is, by multiplying the appropriate representative market or field price by the number of units of the mineral product utilized by the mine owner in its operations. Alabama By-Products Corp. v. Patterson, D.C.N.D.Ala.1957, 151 F. Supp. 641, affirmed 5 Cir., 1958, 258 F.2d 892, certiorari denied, 1959, 358 U.S. 930, 79 S.Ct. 318, 3 L.Ed.2d 303.

5. This court has found as a fact that during the years in issue, representative market or field prices existed for the Pratt seam coal from plaintiff's Mulga and Dolomite mines since there were sales, in the Birmingham district, of coal of like kind and grade to plaintiff's coal. The prices found are as follows:

| Year | Plaintiff's Pratt Seam Coal |
|------|------------------------------|
| 1951 | $8.00 per ton |
| 1952 | 7.85 " " |
| 1953 | 8.10 " " |

It follows, therefore, that plaintiff must compute its depletion base for coal by reference to such representative market prices under the rule of law established by the ABC case, supra.

6. Plaintiff has also raised a question concerning the validity of the

regulation, as applied to the facts of this case, if such regulation is to be construed as requiring plaintiff to determine its deduction for percentage depletion of coal by reference to representative market prices of like kind and grade coals. This issue, involving the validity of the market comparison method of the regulation as distinguished from its interpretation, was not raised in the ABC case. The court concludes, however, that such regulation is valid.

7. It is agreed between plaintiff and the defendant that the plaintiff was entitled to use the proportionate profits method in calculating the gross income from its iron ore mining properties during the years in issue since there was no representative market price for plaintiff's hematite (or "red") ore. In making this calculation, the costs of coal mining should be treated as a cost of the processes beyond the ordinary treatment processes of ore mining. A proportionate profit should therefore be allocated to these costs even though the gross income from the coal mining properties has been determined (by reference to representative market prices) to be an amount less than the sum of the costs of coal mining plus the proportionate profit allocable to such costs.

8. Plaintiff is entitled to use the so-called by-products method in handling sales of by-products from its by-product coke ovens for income tax purposes. The joint products type of method, to which the Commissioner of Internal Revenue desired the plaintiff to change, does not provide a more accurate representation of plaintiff's income than plaintiff's by-product method does. Since there has been no showing that the Commissioner's method is superior, plaintiff should not be required to change to it. Harden v. Com'r, 10 Cir., 1955, 223 F.2d 418.

9. Judgment in conformity with the foregoing findings of fact and conclusions of law will be entered accordingly, in the amount of $2,123,223.36 with interest to the date of entry, such judgment to bear interest as provided by law.

## Judgment

In conformity with the foregoing findings of fact and conclusions of law of the court:

It is ordered, adjudged and decreed by the Court that the plaintiff, Woodward Iron Company, have and recover of and from the defendant, George D. Patterson, District Director of Internal Revenue, the sum of $734,454.78 for the cause of action based on the year 1951, the sum of $625,989.10 for the cause of action based on the year 1952, and the sum of $762,779.48 for the cause of action based on the year 1953, the total for the three years being the sum of $2,123,223.36, together with legal interest thereon as provided by law, and costs of court incurred herein, for all of which execution may issue.