ALABAMA BY-PRODUCTS CORPORA-
TION, Appellant,

v.

George D. PATTERSON, District Director of Internal Revenue, Appellee.

No. 16840.

United States Court of Appeals
Fifth Circuit.

Aug. 29, 1958.

William B. White, William B. White, Jr., S. M. Bronaugh, Edward M. Selfe, Birmingham, Ala., White, Bradley, Arant, All & Rose, Birmingham, Ala., of counsel, for appellant.

Sheldon I. Fink, Harry Baum, Lee A. Jackson, Dept. of Justice, Washington, D. C., Charles K. Rice, John N. Stull, Asst. Attys. Gen., W. L. Longshore, U. S. Atty., Birmingham, Ala., for appellee.

Before HUTCHESON, Chief Judge, and BROWN and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

Alabama By-Products Corporation filed suit to recover income and excess profit taxes for 1952. Recovery depends on the right of this taxpayer to an allowance for percentage depletion on certain coking coal mined by the taxpayer and converted into foundry coke in its by-product coke-ovens.

Section 23(m) of the 1939 Internal Revenue Code, 26 U.S.C.A. § 23(m), provides for "a reasonable allowance for depletion" on mines. Section 114(b)(4) of the 1939 Code allows percentage depletion on coal at the rate of 10 per cent of "gross income from mining" coal, such allowance not to exceed 50 per cent of the "net income from mining" coal. Section 39.23(m)-1(e)(3) of Treasury Regulations 118 allows a taxpayer to use the proportionate profits method[1] of computing "gross income from the property" for purposes of determining percentage depletion. This method may be used, however, only if there is no "representative market or field price of [coal] of like kind and grade". The case, therefore, narrows down to the question, did the taxpayer, Alabama By-Products Corporation, discharge its burden of proving by a fair preponderance of the evidence that there was in the Birmingham area no "representative market or field price of [coal] of like kind and grade" to its Mary Lee and Black Creek coking coal mined by it in 1952?

The case was tried without a jury. The district court held that the taxpayer had failed to discharge its burden: all bituminous coal mined and marketed in the Birmingham area, having coking properties for commercial usage, is coal of "like kind and grade" to the taxpay-

---

1. Under the proportionate profits method, if a taxpayer's mining costs amount, say, to 40 per cent of the total costs of all operations, then 40 per cent of the total gross sales constitutes gross income from mining.

er's Mary Lee and Black Creek coal. We agree.

## I.

Alabama By-Products Corporation, the taxpayer, is engaged in the business of mining and selling coal, manufacturing coke, and selling coke and coal by-products. In 1952 the company mined coal from the Mary Lee and Black Creek seams of the Warrior coal field in Alabama. The Warrior field is one of four bituminous coal fields in the state.

With respect to the Mary Lee seam, taxpayer operated mines at Praco, Colta, and Labuco. All of this coal was cleaned, broken, sized, and loaded for shipment at a preparation plant located at the Praco mine. Coal from the Black Creek seam was extracted from mines located at Bradford and Thermal. This coal was also cleaned, broken, sized, and loaded for shipment by the taxpayer at preparation plants located at the respective mines.

Most of the coal the taxpayer mined was utilized at its own coke ovens in the manufacture of coke to make grey iron foundry coke and malleable iron foundry coke. Some coal was sold to others in the mining area. The taxpayer purchased some coking coal from other mining companies as well. Furthermore, there were extensive sales of coking coal mined from the three other bituminous coal fields by other mining companies, as well as from the Warrior field.

After the Mary Lee coking coal was prepared at the plant at Praco, Alabama By-Products sold 86,690 tons to purchasers at prices ranging from $5.05 to $7.93 per ton. 44,691 tons of the Mary Lee coking coal were sold to a competitor, DeBardeleben Coal Corporation, at prices ranging from $6.30 to $6.89 per ton. DeBardeleben's coke was sold on the same market as that of the taxpayer, and the prices received by DeBardeleben for such coke were substantially the same as those received by taxpayer. Some of their customers were the same. In addition to purchasing from the taxpayer, DeBardeleben purchased other coking coal from the Black Diamond Coal

Mining Company, the Twin Seam Mining Company, and coal mined from the Blue Creek seam in Jefferson County, Alabama. DeBardeleben blended all of these coking coals in the manufacture of its coke.

Republic Steel Corporation also made extensive purchases of Mary Lee coking coal. Some of these purchases were from taxpayer, some were from other vendors. In addition, coal for Republic's coke manufacturing was also purchased from the Pratt and Brookwood seams. The T.C.I. Division of United States Steel Corporation and United States Pipe and Foundry Company also purchased Alabama coking coals during 1952.

As to the Black Creek seam, Alabama By-Products purchased 84,402 tons from Calvert and Youngblood, and 8,850 tons from small truck miners near the Bradford mine at prices ranging from $5.50 to $6.50 per ton. The taxpayer did not sell any Black Creek coal for use in the manufacture of coke by others in 1952; however, some of this coal was sold for use as blacksmith coal at prices ranging from $9.31 to $10.65 per ton. The taxpayer also made some sales to its employees pursuant to union contracts. All of the washed Black Creek coal produced by Dixie Fire Brick Company was purchased by taxpayer at $6.50 per ton.

There were also a number of sales agencies in Birmingham engaged in selling coking coal. One sales agency alone, the Smith Coal Sales Company, sold 371,655 tons of coal in 1952. Of this tonnage, 221,697 tons were coking coals, and of that amount, 98,416 tons were sold for coking purposes. Taxpayer's own sales were made at prices below its average cost of production, but there is no showing that sales by other companies were made under such circumstances.

Turning now to the taxpayer's tax liabilities, the taxpayer reported a gross income of $6,233,080.10 and a net income of $4,555,457.81 in 1952. In computing net income, Alabama By-Products deducted $21,962.04 for depletion of min-

eral resources; of this amount, $20,-729.50 was for the cost depletion of coal. In determining its depletion allowance for coal, the taxpayer used a representative market or field price based on sales made, and computed a percentage depletion deduction. Mining operations were conducted at a loss in 1952. As a result, there was no net income, and the taxpayer could not take the percentage depletion deduction, since it is limited to 50 per cent of net income from mining, under Section 114(b)(2) of the Internal Revenue Code of 1939. The taxpayer was allowed to take cost depletion in the amount of $20,729.50.

Based upon the foregoing computations, Alabama By-Products paid income and excess profits taxes for 1952 in the amount of $2,708,371.59. January 18, 1954, the taxpayer filed a claim for refund with the District Director in the amount of $588.586.97. On February 12, 1956, the District Director assessed additional income taxes, and interest thereon, in the amount of $2,068.18, which were paid. February 23, 1956, the taxpayer filed an amended claim for refund, in substitution for the earlier claim, in the amount of $590,353.16. The claims for refund were based on the taxpayer's revised computation of gross and net income for 1952, on the ground that there was no representative market or field price for coal of like kind and grade, and that Alabama By-Products was therefore entitled to use the proportionate profits method to determine gross and net income from mining in computing its percentage depletion deduction.

These claims were disallowed by the District Director and the taxpayer sued for a refund on March 9, 1956. The original complaint stated that there was no representative market or field price of a coal of like kind and grade. On February 11, 1957, the taxpayer filed an amended complaint stating, in the alternative, that if there was a representative market price for its coal, then its net income from mining was improperly computed because overhead and other costs had been improperly allocated to mining operations. On April 2, 1957, after the trial of the case the taxpayer attempted to amend the complaint a second time. This second amendment stated, in the alternative, that if the taxpayer had not carried the burden of proving that there was no representative market or field price, then such price, if it existed, was greater than that originally used in computing the percentage depletion.

The District Court concluded that Alabama By-Products had failed to show that in the Birmingham area there was no representative market or field price for coal of like kind and grade. The taxpayer was not, therefore, entitled to use the proportionate profits method. As to the amended claims, the court said that they were not raised by the original claim for refund and could not be raised at the trial.

II.

Section 23(m) of the Internal Revenue Code of 1939 provides an allowance for depletion, which, in the case of coal, is equal to the cost of the property depleted or its discovery value.[2] If percentage depletion is utilized Section 114(b)(4)(A) provides that the allowance is equal to 10 per cent of the "gross income property" during the taxable year. Section 114(b)(4)(A) also provides that in no case can the percentage depletion allowance exceed 50 per cent of the net income of the taxpayer from the property. "Gross income from the property" is defined by the statute to mean "gross income from mining", and "mining" is

---

2. Internal Revenue Code of 1939:
   "§ 23. Deductions from gross income.
   In computing net income there shall be allowed as deductions:
   \*      \*      \*      \*      \*
   "(m) Depletion. In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. \*   \*   \*"

defined as including the ordinary treatment processes normally applied in order to obtain a commercially marketable mineral product, after the mineral has been extracted from the ground.[3]

Section 39.23(m)–1(e) (3) of Treasury Regulations 118 provides that if, as here, the mineral product is processed before sale by processes in addition to the ordinary treatment processes, then "gross income from the property" means the representative market or field price as of the date of sale of a mineral product (in this case, coal) of "like kind and grade" at the ordinary treatment processing stage. If there is no representative market or field price, then the so-called proportionate profits method of computing income may be used.[4]

Alabama By-Products contends that the phrase "mineral product of like kind and grade" as used in Section 39.23(m)–1(e) (3) refers to mineral products with the same inherent attributes and characteristics as the depletable mineral in question. The taxpayer points to the many physical and chemical properties that distinguish kinds of coking coals.[5]

3. Section 114(b) (4) (B) provides:
   "As used in this paragraph the term 'gross income from the property' means the gross income from mining. The term 'mining' as used herein shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products, and so much of the transportation of ores or minerals (whether or not by common carrier) from the point of extraction from the ground to the plants or mills in which the ordinary treatment processes are applied thereto as is not in excess of 50 miles unless the Secretary finds that the physical and other requirements are such that the ore or mineral must be transported a greater distance to such plants or mills. The term 'ordinary treatment processes', as used herein, shall include the following: (i) in the case of coal-cleaning, breaking, sizing, and loading for shipment; * * *".

4. "Treasury Regulations 118, promulgated under the Internal Revenue Code of 1939:
   "Sec. 39.23(m)–1 [as amended by T.D. 6096, 1954–2 Cum.Bull 69]. Depletion of mines, oil and gas wells, other natural deposits and timber; depreciation of improvements.
   *    *    *    *    *
   "(e) As used in sections 114(b) (3) and 114(b) (4) (A) and §§ 39.23(m)–1 to 39.23(m)–19, inclusive, the term 'gross income from the property' means the following:
   *    *    *    *    *
   "(3) If the taxpayer sells the crude mineral product of the property in the immediate vicinity of the mine, 'gross income from the property' means the amount for which such product was sold, but, if the product is transported or processed (other than by the ordinary treatment processes described below) before sale, "gross income from the property" means the representative market or field price (as of the date of sale) of a mineral product of like kind and grade as beneficiated by the ordinary treatment processes actually applied, before transportation of such product (other than transportation treated, for the taxable year, as mining). If there is no such representative market or field price (as of the date of sale), then there shall be used in lieu thereof the representative market or field price of the first marketable product resulting from any process or processes (or, if the product in its crude mineral state is merely transported, the price for which sold) minus the costs and proportionate profits attributable to the transportation (other than transportation treated, for the taxable year, as mining) and the processes beyond the ordinary treatment processes. If the taxpayer establishes to the satisfaction of the Commissioner that another method of computation, other than the computation of profits proportionate to costs, clearly reflects the gross income from the property, then such gross income shall be computed by the use of such other method."

5. "Coke is manufactured by placing dry bituminous coking coal crushed to sizes 1″ x 0″ or smaller in a closed retort and applying heat. A coking coal under the influence of heat, first softens and then at a higher temperature becomes fluid; at a still higher temperature the coal decomposes with accompanying evolution of gas; and at a still higher temperature the gas is driven off and the bituminous in the coking coal, acting as an agglutinating agent, bind the remaining materials together to form a cellular structure called coke. A satisfactory coking

Coking coals differ as to volatile matter, ash content, carbon pickup, sulphur content, porosity, and phosphorous content. These differences in coal will cause different kinds of coke to be produced when the coal is heated. The differences in coke, in turn, determine to a large extent the nature of the end product in the manufacture of steel and pig iron. The taxpayer's customers require certain kinds of coke, depending upon the type iron or steel they manufacture. The taxpayer does not go so far as to say that only coking coal with the identical chemical and physical characteristics as that used by the taxpayer to manufacture coke suitable for its own needs is a "mineral product of like kind and grade". The taxpayer does say that the comparison must be with a coking coal that has the same capacities for profitable use; that only coking coals "interchangeable" with appellant's coking coals are of like kind and grade. None of the coking coals sold in 1952 by other companies were suitable to the taxpayer for its use in the manufacture of coke. The taxpayer argues therefore that none of the coking coal sold was of a "like kind and grade" to the taxpayer's.

The common practice in the industry to avoid effects of different physical and chemical characteristics among coking coals is to blend several types of the coal.[6] Blends are constantly adjusted to compensate for the differences in coals so that in effect the only distinction with any commercial substance is whether the coal is of coking or non-coking quality.[7] Alabama By-Products does not, however, blend its coals.

The taxpayer argues that since other coking coals can not meet taxpayer's uses, they are not of like kind and grade.[8] The "end use" test has been rejected by the courts even where it has been specifically mentioned in the tax regulations, and advocated by the Government in

coal must have sufficient bitumens to bind the other components of the coal together. The agglutinating characteristics or bitumen content of coking coals vary widely among different coals. A non-coking coal has either none or too few bitumens to give the coal agglutinating properties and such a coal will not form a satisfactory coke.

"In addition to containing the necessary agglutinating or coking properties a coking coal must have the proper amounts of fixed carbon and volatile matter to make a commercially usable coke and must be low in ash and sulphur to produce foundry coke. A chemical proximate analysis of a coking coal reflects the amounts of fixed carbon, volatile matter, sulphur and ash contained in a coking coal. Coking coals differ substantially in the amount of carbon which the foundry coke made therefrom imparts to the material heated by such foundry coke, such characteristic being referred to as the carbon pickup quality of the coking coal. Coking coals also vary with respect to the physical structure of the coke made therefrom, the strength of a particular coke varying with the size of the air cells and thickness of the walls of the air cells in a piece of coke." Appellant's brief.

6. Coal for furnace cokes need not necessarily be blended, but coal for foundry cokes usually must be blended.

7. But no blends of coal which did not include the Mary Lee coals produced in the Praco area could result in a sufficiently low carbon pickup in the metal being melted by appellant's coke customers to produce a coke for a malleable iron foundry.

8. "The court found that Pratt and American seam coals are not suitable for use by taxpayer in making its foundry coke and Brookwood-Milldale seam coals will not make a foundry coke to conform to taxpayer's specifications. Blue Creek seam coal mined from the Black Diamond Mining Company's Johns and Adger mines differs from taxpayer's Mary Lee coals, in that the latter has a lower carbon pickup; the Underwood seam coal differs from taxpayer's Black Creek seam coal in that the volatile ash and sulphur content of the former was higher and the coking properties lower and such coal was undesirable for taxpayer's foundry coke. However, Blue Creek, Brookwood, Pratt, Thompson, Woodstock, Bynum and Black Creek seam coals were consistently and extensively sold, as coking coal, in the Birmingham districts in the years 1951–1955." Appellant's brief.

arguing some of the cases.[9] Iowa Limestone Co. v. C.I.R., 1957, 28 T.C. 881; Spencer Quarries, Inc., v. C.I.R., 27 T. C. 392; Virginia Limestone Corp. v. C.I.R., 1956, 26 T.C. 553. In the Spencer Quarries case the issue was whether quartzite used as a refractory material should receive different depletion treatment than quartzite used for other commercial purposes. The Tax Court held that quartzite is quartzite, and the particular use for which it is suitable will not make it another kind of material; therefore, uniform treatment was given. Section 39.23(m)–5(b) of Treasury Regulations 118 does make percentage depletion applicable to certain minerals, "used or sold for use" for a stated purpose. Here, in another part of the Regulations, however, the Treasury Department has merely used the phrase "mineral product of like kind and grade". We cannot assume that it was intended that the use to which the property was actually put should be decisive in classifying mineral products for purposes of the representative market price and proportionate profits methods of computing the gross income from mining.

Counsel have cited no cases in their brief that interpret the crucial phrase. We have been unable to find any.

This Court has been called upon more than once to interpret the phrase "like kind" as it is used elsewhere in the 1939 Code. We have consistently held that "like kind" is a broad phrase contemplating the distinction between classes of property (for example, personal and real) no matter how dissimilar they may be in location, in attributes, and in capacities for profitable use. Fleming v. C.I.R., 5 Cir., 1957, 241 F.2d 78; Fleming v. Campbell, 5 Cir., 1953, 205 F.2d 549; C.I.R. v. Crichton, 5 Cir., 1941, 122 F.2d 181. The District Court held, and we agree, that all bituminous coals are of like kind, or of the same general property classification.

The phrase "like grade", as it is used here, has not been interpreted. There is no indication that a narrow interpretation of this phrase was intended. Section 39.23(m)–7 of the Regulations indicates that a liberal interpretation was contemplated:

"(a). If the fair market value of the property at a specified date is to be determined for the purpose of ascertaining the basis for depletion and depreciation deductions, * * [t]he value sought should be that established assuming a transfer between a willing seller and a willing buyer as of that particular date. The Commissioner will give due weight and consideration to any and all factors and evidence having a bearing on the market value, such as cost, actual sales and transfers of *similar* properties, * * *."

It is not unlikely that the term "similar properties" contemplates a "mineral product of like kind and grade".[10] The

9. See Rev.Rul. 56–59, 1956–1, C.B. 626; GCM 24185, 1944, C.B. 132; Treas.Regs. 118, Section 39.23(m)–5(b). The "end use" test would not be applicable here even if accepted by the courts. By the very terms of the statutes and regulations mentioning this test, it applied only to clay, brick and tile, limestone, and calcium carbonates that are used for a stated purpose. Such minerals are entitled to percentage depletion only if used for the stated purpose, whereas, percentage depletion applies to all coal regardless of its use. Thus, end use has no bearing on "like kind and grade". See Treas.Regs. 118, Section 39.23(m)–5(b).

10. There is dictum in C.I.R. v. Crichton, 5 Cir., 1941, 122 F.2d 181 that might indicate that the refined distinctions such as taxpayer argues should be recognized and that the phrase "mineral product of like kind and grade" should be narrowly construed. The court said that "like kind" is general, and does not contemplate "dissimilarities in grade or quality, the unlikeliness, in attributes, appearance and *capacities*." Taxpayer would construe this as an interpretation of "like grade". This is tenuous because the phrase "like grade" was in no way involved in this case, nor was it ever mentioned.

The proposed regulations to section 613 of the 1954 Code, 26 U.S.C.A. § 613,

District Court concluded that all bituminous coals in the Alabama fields are of like grade if commercially suitable for use in the manufacture of coke generally, regardless of the taxpayer's particular needs. To go further and classify coking coals according to their myriad of actual uses would lead to an unworkable system of grading coal, since the requirements of coke users vary so greatly. There would never be, in the case of coking coal, a "mineral product of like kind and grade"; we would have a phrase without meaning.

The sales and purchases of coking coal by DeBardeleben, Republic, United States Steel, United States Pipe and Foundry and others were extensive enough to establish a representative market price. Although the sales made by the taxpayer were in the nature of "forced" sales owing to peculiar economic conditions,[11] the sales of coking coal by the other companies were the natural result of competitive bargaining, and principles of supply and demand. This is enough to create a true market in commerce.[12] Helvering v.

---

strengthen our view that "like kind and grade" contemplates similar properties. The regulations provide in part:

"(4) * * * For the purposes of this paragraph the term 'market price' means the price * * * at which the gross income product is sold commercially * * *. If there are no such commercial sales in such area, then the market price of the gross income product must be determined by the use of other appropriate methods with the objective of determining as accurately as practicable the price at which such gross income product would be sold if such commercial sales existed."

One such appropriate method is:

"(i). Comparison with the prices at which crude mineral products *similar to the taxpayer's* gross income product are sold commercially in the vicinity of the taxpayer's mine with proper adjustment being made for material differences, if any, between taxpayer's gross income product and the products sold commercially (such as differences in kind or grade *or mineral content* or ordinary treatment processes involved or transportation costs between mine and market or relative volume of sales)." Proposed Regulations, Section 1.613-3, P-H, Internal Revenue Code, p. 24,618.10.

Thus, mineral content is distinguished from kind and grade in the proposed regulations.

11. The record shows that since World War I the coal industry has been declining and uncertain. As a result, plants operated on a three day work week and employees were dissatisfied. To remedy this, and to spread overhead costs, taxpayer made sales at prices less than its cost of production. Such sales were not made in open and free competition.

12. Riverton Lime and Stone Co. v. C.I.R., 1957, 28 T.C. 446, indicates that even a

small, declining market can establish a representative market or field price. The Tax Court held that although there were only small sales of pure lime, the price received was the representative market or field price. The proportionate profits method was not allowed because it allocated too large a percentage of the total profit realized by the taxpayer to processes used for producing a better product. The fact remains, however, that the court allowed a sales price in a restricted number of sales to stand as the representative market or field price.

The taxpayer argues that the Riverton case is erroneous and relies strongly on United States v. Cherokee Brick & Tile Co., 5 Cir., 1955, 218 F.2d 424, 425. In that case the taxpayer mined clay which it used to make burnt brick. "Gross income from mining" includes income realized from the first commercially marketable mineral product obtained from ordinary treatment processes. The Government contended that the first commercially marketable mineral product was the clay itself, and that in computing gross income, that which the taxpayer realized from its sales of clay should be included. The court rejected this contention, stating:

"The complaint alleges that, of the brick and tile clay mined in the United States, there is opportunity for the sale of only a negligible quantity before it is put into the form of burnt brick and tile. This allegation is admitted in the answer of the [Government]. For this and other reasons (but mainly for this one) stated in the opinion of the district court, above cited, the judgment appealed from should be affirmed."

The Cherokee Brick & Tile case is not applicable. The question of whether there was a representative market price for clay at the stage of processing prior to the manufacturing of the finished

Walbridge, 2 Cir., 1934, 70 F.2d 683; Heiner v. Crosby, 3 Cir., 1928, 24 F.2d 191. What Judge Learned Hand had to say in the Walbridge case is applicable here [70 F.2d 684]:

"Perhaps there need not be a 'market' to establish a 'market value,' but there must be some assurance that the value is what a 'market' would establish; and a 'market' itself presupposes enough competition between buyers and sellers to prevent the exigencies of an individual from being exploited. It may well imply that the goods have several possible buyers, so that a necessitous seller shall not be confined to one; and that there are several possible sellers of the same goods or their *substantial* equivalent, so that a hard-pressed buyer shall not have to accept the first offer."

There is no contention that the coking coal sold by other companies and agencies is identical with the taxpayer's, but, for practical purposes, it was of "like kind and grade", a "substantial equivalent" sold and purchased in free competition.

■ The proportionate profits method provided by the Regulations was not intended to assure percentage depletion to a taxpayer who conducts his mining operations at a loss. It is designed to operate only with respect to gross income, subject to the 50 per cent limitation, and only when there is no representative market or field price at the ordinary treatment processing stage. If there is such a price at which the taxpayer could sell, but it happens that the taxpayer, as here operates that phase of the business at a loss, then the 50 per cent net income limitation precludes the allowance. The taxpayer's remedy lies with Congress.

■■ Summarizing, we have a situation here that calls for some workable definition of the phrase "mineral product of like kind and grade". Of course there are differences in coal. Here, it seems to us, as a practical matter, the differences are meaningless if a coal meets the standard of coking quality. In effect, this is the standard used commercially in the area. The Commissioner would have a difficult, if not impossible, task, if he had to determine whether one coal was "interchangeable" with another coal; there are so many variables in the composition of coal, that even all coal from the same seam is not necessarily interchangeable. We agree, therefore, with the district court that "like kind and grade" means as to "kind", all bituminous coals mined in the Birmingham area, and, as to "grade", means all coals having coking quality suitable for commercial use. Since the taxpayer's coals are of like kind and grade to other *coking coals that were sold in the area,* the taxpayer has failed to meet its burden of proving that there was no representative market or field price for its coals.

### III.

■ We affirm also the dismissal of the amended claims for refund. All grounds upon which a taxpayer relies must be stated in the original claim for refund so as to apprise the Commissioner of what to look into; the Commissioner can take the claim at its face value and examine only those points to which his attention is necessarily directed. United States v. Garbutt Oil Co., 1938, 302 U.S. 528, 58 S.Ct. 320, 82 L.Ed. 405. Anything not raised at that time cannot be raised later in a suit for refund. Carmack v. Scofield, 5 Cir., 1953, 201 F.2d 360, 362. The taxpayer's claim for refund was based solely on the ground that there was no representative market price. There was no attempt to raise the question of the correctness of an existing representative price. In fact, the

brick was not involved; the issues were limited to whether the processes applied were ordinary treatment processed, and whether the finished product was a mineral product. Mertens, Law of Federal Income Taxation, Section 24.32b, n.

76. The issue here is whether there exists a representative market price for a mineral product of like kind and grade to coking coal mined by the taxpayer. Cherokee Brick & Tile does not help to answer this.

claim for refund precluded this question. There was likewise no attempt to raise the question of any improper allocation of overhead and other expenses.

What we said in the Carmack case applies with equal vigor here:

"A taxpayer is not permitted to advance one ground for refund in his claim filed with the Commissioner and thereafter rely upon an entirely different ground in a subsequent suit for refund, *but is confined to the scope of the grounds for refund asserted in his claim filed with the Commissioner.*"

The judgment is

Affirmed.