**Dennis E. GREENMAN and Jayne E. Greenman, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 86–0314–Civ–EPS.**

United States District Court, S.D. Florida, Miami Division.

April 26, 1989.

---

Lawrence R. Metsch, Miami, Fla., for plaintiffs.

Paul E. Pelletier, U.S. Atty., Miami, Fla., for defendant.

## MEMORANDUM OPINION

SPELLMAN, District Judge.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This cause came before this Court for trial on July 2, 24, and 27, 1987. The Court having considered the testimony of the witnesses, the evidence presented, the arguments of counsel and being otherwise fully advised in the premises, now enters the following findings and conclusions in accordance with Rule 52 of the Federal Rules of Civil Procedure. Both findings and conclusions are dealt with in narrative form.

### I. FINDINGS OF FACT

Plaintiffs DENNIS E. GREENMAN and JAYNE E. GREENMAN are citizens and residents of Dade County, the Southern District of Florida.

On June 16, 1980, Plaintiffs filed a joint federal income tax return for the year 1979 reporting wage, salaries and tips in the amount of $290,668, and an adjusted gross income of $148,013.

On or after April 7, 1981, Plaintiffs filed a joint federal income tax return for the year 1980 reporting wages, salaries and tips of $1,731,175 and an adjusted gross income of $1,738,727. Schedules A and B of the 1980 joint income tax return also claimed an interest expense deduction in the amount of $44,635, a charitable contribution deduction in the amount of $203,800 and deductible business expenses in the amount of $32,077. Also, although the tax due per the return was $195,820, a notation on the return just above the signature block indicated that the taxpayers were "sending $227,000" with the return.

On December 3, 1981, Plaintiffs filed a joint amended federal income tax return for the calendar year 1979. Plaintiffs' amended 1979 tax return reflected additional unreported income for the year 1979 in

the amount of $198,006.00 and an income tax balance due of $121,665.00.

On December 3, 1981, Plaintiffs also filed a joint amended federal income tax return for the calendar year 1980. Plaintiffs' amended 1980 income tax return reflected additional unreported income for the year 1980 in the amount of $1,352,222.00 and an income tax balance due of $734,751.00.

The amended joint 1979 and 1980 returns reflected additional illegal income of Dennis Greenman, not claimed on the original joint returns.

The Internal Revenue Service (IRS), based upon Plaintiffs' amended 1979 and 1980 income tax returns, on December 3, 1981, assessed the following income tax liabilities against Plaintiffs:

> 1979: 121,319.94
> 1980: 765,721.24
>
> 887,041.18

On June 7, 1982, Plaintiffs filed a joint federal income tax return for the year 1981 reporting wages, salaries and tips of $1,453,645 and an adjusted gross income of $1,552,669. The 1981 joint return indicated that $435,649 in federal taxes had been withheld and that Plaintiffs had overpaid their federal taxes in the amount of $240,930. Schedule A of the 1981 joint return indicated that Plaintiffs were claiming a miscellaneous deduction in the amount of $1,050,000. An attached statement to the return indicated that the $1,050,000 miscellaneous deduction was comprised of $550,000 which Plaintiffs had paid in legal fees and $500,000 which represented the "value" of assets disgorged by Plaintiffs to the court-appointed Receiver, Hugo L. Black.

Subsequent to the filing of the 1981 joint return, the IRS determined that Plaintiffs had indeed overpaid their 1981 income taxes by the claimed amount of $240,930, as well as an additional $31,180 in overpayment credits, for a total 1981 overpayment of $272,110. The $272,110 overpayment was applied to Plaintiffs' outstanding 1979 and 1980 joint income tax liability; as a result of the application of overpayment, Plaintiffs' joint 1979 tax liability was satisfied and their 1980 joint tax liability was reduced to $548,694, exclusive of additional accrued interest and penalties.

On August 8, 1984, Plaintiffs filed an amended joint income tax return for the year 1981. The amended joint 1981 return sought an increase in deductions for that year based on an alleged increase in the value of the items disgorged to the Receiver, which items had been ascribed a $500,000 value on Plaintiffs' original 1981 joint return. Accordingly, Plaintiffs reported the following net increase in their previously claimed disgorgement deduction:

Sale of house at 6425 S.W. 110 Street, Miami, Florida,

| | | |
|---|---|---|
| Actual Cost over Mortgage | 575,000 | |
| Less: Proceeds over Mortgage | (239,773) | $ 335,227.00 |
| Diamonds, Appraised at | | 518,664.00 |
| Cash | | 74,700.00 |
| Limited Partnership Interest, at cost | | 50,000.00 |
| Equity in Fort Lauderdale Condominium | | 63,000.00 |
| | | |
| Actual amount of disgorgement | | $1,041,591.00 |
| | | |
| Less: Estimated amount of disgorgement taken by taxpayers on their original 1981 tax return | | (500,000.00) |
| | | |
| Net Increase in Disgorgement | | $ 541,591.00 |

As a result of their amended 1981 joint return, Plaintiffs claimed an additional overpayment for the year 1981 in the amount of $163,539.

Plaintiffs have not filed with the IRS an administrative claim for refund for the years 1979 and 1980.

Plaintiff, DENNIS E. GREENMAN, ("GREENMAN") from 1977 through 1981, operated one of the largest securities fraud programs in South Florida. GREENMAN derived illegal income from the fraudulent scheme in two ways. First, Becker would pay Barclay for the commission it earned based on the transactions which actually occurred. Barclay would then pay GREENMAN these commission checks where appropriate. Second, GREENMAN would forge endorsements on checks written by investors which were to be deposited into one or another of the 588 accounts for eventual investment in the Program. Money which GREENMAN derived from the Program directly went into one of two bank accounts at the Royal Trust Bank or the Pan American Bank.

On April 1, 1981, the Securities Exchange Commission (SEC) filed a complaint in the United States District Court for the Southern District of Florida, *SEC v. Barclay Financial Corp.*, Case No. 81–708–CIV–WMH (S.D.Fla.) (the civil action), seeking a temporary restraining order, a preliminary and permanent injunction prohibiting Barclay Financial Corp., and its employees, from trading securities and disposing of investors' assets; the complaint also sought the appointment of a receiver. By Order dated April 2, 1981, the Court granted the Temporary Restraining Order, appointed Hugo L. Black as receiver and set a hearing on April 10, 1981, for a determination on the SEC's motion for a preliminary injunction.

On April 10, 1981, the SEC filed an amended complaint adding DENNIS E. GREENMAN as a party defendant, and a motion requesting injunctive and ancillary relief against the defendants including an order of disgorgement of all benefits received by GREENMAN from his fraudulent conduct as well as an order imposing a constructive trust over all of GREENMAN's fraudulently obtained assets. By Order dated April 10, 1981, GREENMAN was enjoined from selling, or offering for sale, securities and from dissipating his assets and assets of the investors. The Court further ordered GREENMAN to file a schedule of assets under his control and a schedule of living expenses.

On April 16, 1981, GREENMAN filed a schedule of "ordinary and necessary living expenses" and of expenses "needed to preserve assets, real or personal property." On page 3 of the April 16, 1981, schedule, GREENMAN listed monthly "estimated tax payments" of $20,000 as an expense necessary to preserve assets. On May 5, 1981, the Receiver filed a Memorandum in Opposition to Allowing Greenman $20,000 per month for payment to the IRS.

After a hearing, the Court issued a preliminary injunction on May 27, 1981, enjoining GREENMAN from "dissipating, transferring, concealing or disposing of in any manner any assets, choses in action or other property of Dennis E. Greenman and any assets of customers of defendant Barclay, in his possession custody or under his control," without first obtaining court approval. The Court also issued another Order on May 27, 1981, in which the Court refused to permit GREENMAN's requested allocation of $20,000 per month as estimated tax payments for potential taxes in 1981. Specifically, the Court found:

> [t]hat a preliminary showing has been made that the commissions received by Greenman as a result of investments made on behalf of the customers of Barclay Financial Corp. were fraudulently obtained. Having been so acquired, *these commissions constitute trust funds belong to Barclay customers.* Since fiduciary funds diverted from the true owner to another are deemed to belong to the owner, *State ex rel Harris v. Gautier* [108 Fla. 390] 147 So. 240 (Fla.1933), such funds cannot be used to satisfy a tax obligation of the wrongdoer. *Dennis [James] v. United States*, 366 U.S. 213 [220] 6 L.Ed.2d 246, 254, 81 S.Ct. 1052 [1056] (1961). Accordingly, Defendant Greenman's personal assets should not be utilized to pay any tax liability, at this time. (Emphasis added.)

On June 8, 1981, GREENMAN filed a Notice of Appeal from the Court's May 27, 1981, Order preventing monthly estimated tax payments of $20,000. Pending appeal, GREENMAN sought a stay of the May 27, 1981, Order. By Order dated August 24, 1981, however, the Court denied GREENMAN's application for stay.

GREENMAN appealed the May 27, 1981, Order to the former Fifth Circuit Court of Appeals. After a full briefing of the issue by GREENMAN, the Receiver and the SEC, however, GREENMAN voluntarily dismissed his appeal on May 10, 1982.

Meanwhile, on May 1, 1981, the Court issued an Order finding that funds which were part of GREENMAN's Short–Term Trading Program were the investors' funds and, consequently, "any bank accounts or other depositories of these funds would be considered fiduciary accounts." Accordingly, the Court issued a Temporary Restraining Order precluding "the transfer or dissipation of any such funds."

On October 31, 1981, the SEC filed a Motion for Summary Judgment and Partial Disgorgement seeking an interim order of disgorgement. The SEC also filed on October 13, 1981, a Motion for an Expedited Hearing on the SEC's Motion for Partial Disgorgement. On November 16, 1981, a final hearing on disgorgement was set for December 7, 1981.

Pursuant to a United States Department of Justice Strike Force investigation into GREENMAN's illegal activities, an Information was filed on November 30, 1981, in the United States District Court for the Middle District of Florida, Tampa Division, charging GREENMAN with violating Title 18 U.S.C. Section 2314 by devising a scheme to defraud a Mr. Lynwood Maddox and others of property valued in excess of $5,000.

On December 3, 1981, GREENMAN entered into a plea agreement with the United States Department of Justice. Pursuant to the plea agreement, the Department of Justice agreed not to make a sentencing recommendation and GREENMAN agreed to "pay over to the appropriate person substantially all of his assets in whatever form held by way of restitution, and having a current value of approximately $1,714,-561.00." Prior to executing the plea agreement, GREENMAN had executed an affidavit setting forth all of his illegally obtained assets which he claimed to have a total value of approximately $1,800,000.00.

At GREENMAN's arraignment on December 3, 1981, GREENMAN waived indictment and pleaded guilty to the Information. During the arraignment the following colloquy took place between the Court, counsel and GREENMAN:

THE COURT: Under the Plea Agreement you could be sentenced to ten years in prison or a $10,000 fine or both. Although, I do note that the plea agreement provides that the entry of this guilty plea to the information is in satisfaction of all charges that could have been brought out of or relating to your operation of the so-called Special Arbitrage Program and the short term trading program during the years 1977 through 1981.

And I also note that you and the Department of Justice agree that the Department of Justice shall make no recommendation as to the sentence, if any, imposed on upon you.

And finally I note that you and the Department of Justice agree that you shall pay over to the appropriate person substantially all of your assets, in whatever form held, by way of restitution and having a current value of approximately $1,714,561. *Who is the appropriate person,* Mr. James?

MR. JAMES [Special Assistant United States Attorney]: *Judge, a receiver has been appointed down in Miami.*

THE COURT: All right. That's what you would contemplate by this agreement; do you understand that, Mr. Brodsky?

MR. BRODSKY [Counsel for Greenman]: *Yes, Your Honor.*

THE COURT: Mr. Greenman?

MR. GREENMAN: *Yes sir.*

(Emphasis added.) The Court then accepted Greenman's guilty plea, but rejected the plea agreement.

Without informing in advance the parties or the Court in the civil action, nor the Government or the Court in the criminal action, on December 3, 1981, GREENMAN met with Robert Kasper of the Internal Revenue Service and tendered the previously mentioned amended 1979 and 1980 tax returns reflecting previously undisclosed illegal income.

At the December 3, 1981, meeting with Revenue Officer Kasper, pursuant to section 6331 of the Internal Revenue Code of 1954 (26 U.S.C.), Revenue Officer Kasper determined that collection of the taxes was in jeopardy and, accordingly, on December 4, 1981, made notice and demand for payment upon Plaintiffs pursuant to Section 6331(a) of the Code.

Plaintiffs also filed with the Internal Revenue Service, on December 4, 1981, a Form 433 collection information statement. In the collection information statement, Plaintiffs identified various real and personal property as their own and valued such property at approximately $1.7 million. No mention was made in the Form 433 of the constructive trust imposed by the Court on all of GREENMAN's property, nor of the Court's May 27, 1981, Order prohibiting estimated tax payments.

Pursuant to Section 6331 of the Code, the IRS on December 4, 1981, recorded its Notices of Federal Tax Lein against all property and rights to property belonging to Plaintiffs and served Notices of Levy on the banking institutions identified by Plaintiffs in the Form 433.

All money and property subject to the federal tax liens and upon which the Internal Revenue Service levied, save Plaintiffs' personal residence and $40,000 belonging to JAYNE GREENMAN, was acquired with funds derived from the defrauded investors.

Pursuant to the above-described IRS Notices of Levy, the IRS received a total of $285,005.89, which amount, except for the $40,000 belonging to JAYNE GREENMAN, was directly traceable to the defrauded investors. That amount was credited by the IRS against Plaintiffs' 1979 and 1980 tax liability.

On July 14, 1983, the IRS reversed $245,005.89 in payment credits previously afforded Plaintiffs' as a consequence of the December, 1981, IRS levies upon Plaintiffs' bank accounts. Subsequently, on August 10, 1983, pursuant to a settlement agreement between the IRS and the Receiver, the IRS returned $245,005.89 of the seized funds to the Receiver for distribution to the defrauded investors. The IRS retained the $40,000 originally belonging to JAYNE GREENMAN.

On December 7, 1981, immediately prior to the disgorgement hearing, through the filing of a status report, GREENMAN notified the Court in the civil action, for the first time, that he was attempting to satisfy his tax liability with money held in constructive trust for the investors. In the status report, GREENMAN indicated that he would acquiesce in the summary judgment motion filed by the SEC seeking disgorgement of all ill-gotten wealth. At the disgorgement hearing of December 7, 1981, the Court ordered immediate disgorgement of all ill-gotten wealth in GREENMAN's possession. On that same date the Court entered a written order of partial disgorgement ordering GREENMAN to pay to the Receiver $3,313,055.10.

At the continuation of the sentencing hearing on January 28, 1982, GREENMAN refused to withdraw his plea, stating through counsel, "we wish to remain bound to what we think is still a viable agreement and not to withdraw the plea." GREENMAN, in turn, was sentenced to the maximum ten-year term. GREENMAN's appeal of the sentence subsequently was rejected by the Eleventh Circuit Court of Appeals in *United States v. Greenman,* 700 F.2d 1377 (11th Cir.) *cert. denied,* 464 U.S. 992, 104 S.Ct. 482, 78 L.Ed.2d 680, (1983).

Between December 7, 1981, and December 31, 1981, Plaintiffs conveyed title or delivered to the Receiver substantially all of their assets, including the following:

A. Residence located at 6425 S.W. 110th Street, Miami, Florida.

B. Diamonds.

C. $74,700.00 in cash.

D. Two (2) limited partnership interests.

E. Condominium apartment located in Fort Lauderdale, Florida.

The Receiver conducted an arms length sale of Plaintiffs' house at 6425 S.W. 110th Street, Miami, Florida, and recovered the following net amount for distribution to the defrauded investors:

| | |
|---|---|
| Proceeds of Sale | $268,022.83 |
| Forfeiture on Sale | 50,000.00 |
| | $318,022.83 |
| Less: | |
| Real Estate Commission | (53,022.00) |
| Upkeep Prior to Sale | (81,555.10) |
| Net Cash for Distribution to Investors | $183,217.73 |

The Receiver conducted an arms length sale of Plaintiffs' diamonds and recovered the following net amount for distribution to the defrauded investors:

| | |
|---|---|
| Proceeds of Sale | $118,750.00 |
| Less: | |
| Gem Testing | (2,707.00) |
| Net Cash for Distribution to Investors | $116,043.00 |

On December 18, 1981, the Receiver did receive a cash disbursement from GREENMAN in the amount of:

$74,700.00

As of April 16, 1986, the Receiver had received for distribution to defrauded investors the following amount of cash distributions from Plaintiffs' partnership interests, which interests the Receiver maintains has no discernible market value:

$11,380.00

After an arms length sale of Plaintiffs' Fort Lauderdale condominium, the Receiver sustained the following loss, resulting from upkeep costs prior to the sale/foreclosure and expenses paid by the Receiver after the sale:

($88,904.58)

Accordingly, the defrauded investors, through the Receiver, realized $296,436.85 from the assets disgorged by the GREENMAN's.

During the nine (9) months commencing December 4, 1981, neither the Receiver, nor any investor in the programs operated by GREENMAN submitted an administrative claim to the IRS, pursuant to § 6532(c) of the Internal Revenue Code, for relief from a wrongful IRS levy upon property allegedly belonging to persons other than Plaintiffs. During the nine (9) month period commencing December 4, 1981, neither the Receiver, nor any investor in the programs operation by GREENMAN filed suit against the United States, pursuant to § 7426(a)(1) of the Internal Revenue Code, for damages suffered as a consequence of a wrongful IRS levy upon property allegedly belonging to persons other than Plaintiffs.

Plaintiff JAYNE GREENMAN possesses an Associates Degree in Business Administration from the New York Institute of Technology; studied accounting; and has been employed as a part-time bookkeeper.

JAYNE GREENMAN did not see the paychecks or W-2 forms of DENNIS GREENMAN during the years 1979 through 1981. This Court does not find it credible, however, that she also signed the joint federal income tax returns for the years 1979 through 1981 without looking at any of the figures set forth in the returns.

DENNIS GREENMAN's reported adjusted gross income on Plaintiffs' joint 1977 and 1978 federal tax returns was $6,414 and $37,898, respectively.

During the fall of 1978, Plaintiffs jointly purchased a house in Miami, Florida. Prior to this purchase they had resided with their two children in an apartment in Jacksonville, Florida.

Most, if not all, of the $40,000 down payment on the Miami home was paid by JAYNE GREENMAN from funds gifted to her by her father as DENNIS GREENMAN did not have enough funds for such an expenditure.

During 1979, DENNIS GREENMAN purchased a new station wagon automobile for JAYNE GREENMAN.

During 1979, DENNIS GREENMAN had only one bank account, located at the Royal

Trust Bank. The bank statements for this account were mailed directly to Plaintiffs' residence.

During 1979, JAYNE GREENMAN also had only one bank account which was located at Dade Savings & Loan Association. The bank statements for this account were also mailed to Plaintiffs' residence.

During 1980, DENNIS GREENMAN opened eight to ten bank accounts at various banking institutions in and around Miami. Most of the statements reflecting the activity in these accounts were mailed to Plaintiffs' residence. DENNIS GREENMAN used these accounts, as well as the Royal Trust account, to deposit the embezzled funds.

During 1980, JAYNE GREENMAN had two bank accounts in her name—one at Dade Savings & Loan Association and one at Dadeland National Bank. The bank statements for these accounts were mailed directly to Plaintiffs' residence. JAYNE GREENMAN deposited her personal savings into each of these accounts. DENNIS GREENMAN also used JAYNE GREENMAN's Dadeland National account to deposit funds embezzled from investors.

During 1980, Plaintiffs maintained a joint bank account at the Commercial Bank of Kendall. The bank statements for this account were mailed directly to Plaintiff's residence. DENNIS GREENMAN also used the joint Commercial Bank account to deposit funds embezzled from investors.

During 1979 and 1980, JAYNE GREENMAN on some occasions received the mail, reviewed it and opened mail addressed to her. She also at times paid, by check, household bills, including the home mortgage.

During 1980, Plaintiffs went out to dinner virtually every evening and spend between $50 and $70 on dinner on each occasion.

During 1980, JAYNE GREENMAN was given an average allowance of $200 per week by DENNIS GREENMAN; was never refused excess funds when she needed more; and went clothing shopping at least twice per month.

On May 29, 1980, Plaintiffs made a down payment of $60,000 on, and jointly purchased, a condominium in Fort Lauderdale. The total purchase price of the condominium was $300,000, with monthly mortgage payments of $2,843.70. While this condominium was purchased for the use of JAYNE GREENMAN's father, it was to be jointly owned by Plaintiffs and they understood that they were to make the mortgage payments.

On July 15, 1980, Plaintiffs made a deposit of $130,535.90 on, and jointly purchased, a home under construction located at 6425 S.W. 110th Street, Miami. The total purchase price of the home was $636,906.

In November, 1980, Plaintiffs donated $200,000, in the name of JAYNE GREENMAN's mother, toward the construction of a sanctuary at Temple Samuel in Miami; and purchased for $20,000, and paid for in full, a 1981 model Lincoln Continental.

63. In 1980, Plaintiffs purchased a limited partnership interest in the name of JAYNE GREENMAN for $25,000; and vacationed in Jamaica and the Quaker Hill Cottages, Catskills, New York.

In 1980, DENNIS GREENMAN purchased a diamond spinning ring, a bracelet and a gold pendant for his wife.

In 1980, JAYNE GREENMAN's bank account at Dadeland National Bank contained over $160,000 in funds embezzled from investors by DENNIS GREENMAN; and Plaintiffs' joint bank account at the Commercial Bank of Kendall contained over $90,000 in funds embezzled from investors by DENNIS GREENMAN.

That same year, DENNIS GREENMAN paid approximately $1,000,000 for diamonds from a New York jewelry broker.

On March 15, 1981, Plaintiffs paid $550,000 to the law firm of Paul, Landy and Bailey, P.A., for representation of both their interests in the above-referenced civil and criminal actions.

On March 17, 1981, Plaintiffs entered into a closing agreement with reference to the home jointly owned by them and located at 6425 S.W. 110th Street; and paid the

seller $191,688.50 in cash upon closing, jointly signing a mortgage for the remaining $300,000 of the purchase price, with monthly mortgage payments of $3,690.24. On or about that same day, DENNIS GREENMAN made disbursements from proceeds of his scheme to JAYNE GREENMAN's father and relatives of her stepmother in the total amount of $1,892,534.

From July 15, 1980 through March 17, 1981, Plaintiffs expended over $400,000 for improvements on the house jointly owned by them and located at 6425 S.W. 110th Street. JAYNE GREENMAN supervised and oversaw all of these improvements.

On March 28 and 29, 1981, Plaintiffs conferred regarding DENNIS GREEN-MAN's embezzlement activities. During these conversations DENNIS GREEN-MAN informed JAYNE GREENMAN that he did something illegal with the stock market and that he would probably go to jail for thirty years.

By April 1, 1981, Plaintiffs had expended $7,000 to $10,000 on their son's Bar Mitzvah.

By April 1, 1981, the news services in Miami first published stories concerning the securities fraud perpetrated by DENNIS GREENMAN through the various brokerage houses. By April 3, 1981, news of the DENNIS GREENMAN securities fraud had been carried by local and national media and the Miami Herald ran a prominent story explaining that DENNIS GREEN-MAN's securities fraud may have involved "tens of millions of dollars."

On April 7, 1981, JAYNE GREENMAN, along with DENNIS GREENMAN, signed the joint federal 1980 income tax return, which understated Plaintiffs' income by $1,352,222. JAYNE GREENMAN, however, as had been her practice, declined to read any portion of the return before signing it.

During April of 1981, Plaintiffs resided in the house located at 6425 S.W. 110th Street, Miami, for a few days over the Passover holidays.

By April 7, 1981, JAYNE GREENMAN knew or had reason to know of all of the above-referenced expenditures and deposits and, therefore, knew or had reason to know of the substantial understatement reflected on the joint 1980 return.

With the exception of the diamonds purchased by DENNIS GREENMAN for over $1,000,000 and the $1,892,534, paid to JAYNE GREENMAN's father and relatives of her stepmother, JAYNE GREEN-MAN significantly benefited from all of the above-referenced expenditures and deposits.

## II. CONCLUSIONS OF LAW

### A. Subject Matter Jurisdiction

The parties do not dispute this Court's jurisdiction over Plaintiffs' claim for a 1981 tax refund. However, Plaintiffs also seek refunds for the years 1979 and 1980. The government does dispute this Court's jurisdiction over those claims.

Plaintiffs seek to invoke the ancillary jurisdiction of this Court to avoid the procedural requirements of 26 U.S.C. § 7422(a) which provide in part that "[n]o suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax ... until a claim for refund or credit has been duly filed...." In this case, no claim for refund or credit under § 7422(a) has been made for the years 1979 or 1980; however, the Plaintiffs argue that the "tight nexus" of the subject matter (the refund claim for 1981, and the claims for 1979 and 1980) supports ancillary jurisdiction. Plaintiffs also argue that by accepting jurisdiction, this Court will avoid piecemeal litigation.

The essence of the cases which sustain the procedural requirements of § 7422(a) is that the initial determination of questions of tax liability is the proper province of the Internal Revenue Service. The courts' logic was clearly delineated in *In re Statmaster Corporation*, 465 F.2d 978 (5th Cir. 1972).[1] In that case, a trustee in bankrupt-

---

1. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down

cy sought a determination that the filing of a tax return in a particular form would preclude the assessment of a deficiency by the Commissioner. The court held that this amounted to a request for a declaratory judgment with respect to a tax matter and was therefore expressly barred by 28 U.S. C. § 2201. The court stated that "[t]his prohibition comports with the statutory scheme which gives the Internal Revenue Service the right to determine possible tax liability in the first instance." *Id.* at 980. The court went on to say that "Congress has clearly indicated that the initial decisions in such cases is for the Commissioner, not the federal courts." *Id.*

The principles annunciated in *Statmaster* were subsequently applied in *Chapman v. United States,* 485 F.2d 1194 (9th Cir.1973), where the district court had originally held that the taxes for later years were "inextricably combined with the adjudications for [prior years]" and ordered a deduction and refund for the later years in the absence of a prior filing of a claim for refund. *Chapman* at 1195. The Ninth Circuit reversed and held that the district court was without jurisdiction where claims for the prior years had not been previously filed. *Id.*

More recently, the Eleventh Circuit discussed the same issue. The court specifically held that "filing a claim for an administrative refund is a jurisdictional prerequisite to a maintenance of a refund suit." *King v. United States,* 789 F.2d 883, 884 (11th Cir.1986) *citing United States v. Felt & Tarrant Mfg. Co.,* 283 U.S. 269, 51 S.Ct. 376, 75 L.Ed. 1025 (1931).

Finally, the Supreme Court of the United States has long held that such procedural requirements must be specifically satisfied. *Angelus Milling Co. v. Commissioner,* 325 U.S. 293, 65 S.Ct. 1162, 89 L.Ed. 1619 (1945). In *Angelus Milling,* the Court stated that compliance was not waived by the mere fact that the Internal Revenue Service had investigated the merits of the refund claim. *Id.* at 296, 65 S.Ct. at 1164. Even where the facts to support a claim for refund are before the Commissioner, the

claim must be specific or the Commissioner must unmistakably waive such specificity. *Id.* at 297, 65 S.Ct. at 1164.

For example, the court in *Stoller v. United States,* 444 F.2d 1391, 1392 (5th Cir. 1971), held that "[b]ecause taxpayers have not met the procedural requirements ... we hold they may not challenge the Commissioner's deficiency determination." In that case, the taxpayers failed to specify their reliance on the valuable consideration rule and failed to allege facts to support it although the information was arguably known to the Commissioner. In its analysis, the court stated that "the Commissioner can take the claim at its face value and examine only those points to which his attention is necessarily directed." *Id.* at 1392 *quoting Alabama By–Products v. Patterson,* 258 F.2d 892, 900 (5th Cir.1958).

■ In the present case, it is admitted that no procedurally appropriate claims have been filed for refunds in 1979 or 1980 on "innocent spouse" grounds or any other grounds. On the authority cited, there is no issue which can properly be brought before any court, and there can be no nexus with the question properly before this Court; nor will the posture of these claims support any appropriate concern related to piecemeal litigation. While ancillary jurisdiction may properly be exercised in the absence of a federal question or diversity of citizenship or the absence of any particular jurisdictional amount in controversy, this Court finds no precedent to support the use of such jurisdiction to avoid the express intent of Congress and the overwhelming weight of case law which mandates that the initial determination of tax liability is to be made by the Commissioner in response to procedurally proper claims. This Court, therefore, has no jurisdiction as to any claim for refund of the 1979 and 1980 payments.

■ The taxpayers' claim may also be understood as an attempt to enjoin the collection of tax against the "innocent spouse." While such injunctions are barred by the Anti–Injunction Act, 26 U.S.

prior to the close of business on September 30, 1981.

C. § 7421(a), there is a narrow judicial exception that requires that such a claim meet each part of a two-prong test. The application of this exception was considered in *Steele v. Regan*, 755 F.2d 1091 (4th Cir.1985), where the taxpayer's wife asserted the "innocent spouse" defense because she had signed tax returns at the husband's insistence and without knowledge of their contents. Nonetheless, the court held that her claim could not meet the first prong of the test for the judicial exception to the statute because it was not clear "that under no circumstances could the Government ultimately prevail...." *Id.* at 1093. Because this Court reaches the same conclusion as to JAYNE GREENMAN's claims in the present case, it is unnecessary to consider the second prong of the test.

### B.  1979 and 1980 Refund Claims

■ As discussed above, this Court is without jurisdiction to consider Plaintiffs' claim for refunds for the years 1979 and 1980. Further, even if this Court had jurisdiction, Plaintiffs would lack standing to bring such a claim.

Plaintiffs argue that they are entitled to a refund of federal income taxes paid in 1979 and 1980 by virtue of an alleged "credit" they claim to be due as a result of funds initially levied upon by the IRS, but which funds were subsequently returned to the receiver for distribution to the defrauded investors. Specifically, Plaintiffs claim that they are entitled to payment credit against their 1980 income tax liability in the sum of $484,778.83, representing the $245,005.89 paid to the Receiver pursuant to the settlement agreement between the Receiver and the IRS, and the $239,772.83 in cash proceeds derived from the sale of Plaintiffs' residence located at 6425 S.W. 110th Street, Miami, Florida, against which the IRS had levied. Plaintiffs argue that the settlement agreement between the Receiver and the IRS was unlawful in that the only remedy available to the Receiver to recover monies which the United States has levied upon, is a wrongful levy action. Because that wrongful levy action was not brought within the nine (9) month statute of limitations, the settlement, and the relinquishment of the IRS tax lien, is invalid, and the funds must be recredited against Plaintiffs' 1979 and 1980 tax liability.

Plaintiffs do not have standing to argue whether the settlement agreement is valid, even assuming that such an argument would have merit. The evidence establishes, and it was admitted, that all of the funds seized by the IRS and subsequently returned to the Receiver were funds that were fraudulently obtained from the investors. Case law clearly establishes that such funds "belong to the true owner." *First National Bank v. Hill*, 412 F.Supp. 422 (N.D.Ga.1976). Accordingly, Plaintiffs have no standing to argue that the IRS should have applied funds belonging to the defrauded investors to satisfy the Plaintiffs' own tax liability. *American Society of Travel Agents, Inc. v. Blumenthal*, 566 F.2d 145 (D.C.Cir.1977).

### C.  1981 Refund Claim

In their original joint 1981 tax return, Plaintiffs claimed a deduction for the "estimated value" ($500,000) of certain enumerated assets disgorged to the Receiver. The IRS allowed this deduction and credited Plaintiffs with $272,110, which was applied to Plaintiffs' outstanding 1979 and 1980 joint income tax liability.

Plaintiffs' amended joint 1981 return sought an increased deduction for the enumerated disgorged assets based upon a higher "value" ascribed to those assets—$1,050,000. Plaintiffs claimed that this higher value reflected the actual purchase price of most of the disgorged assets, as well as the appraised value of the diamonds disgorged to the Receiver.

There is no dispute that Plaintiffs disgorged to the Receiver the $74,700 in cash claimed on the original 1981 return; the dispute concerns the method of establishing the amount deductible when an embezzler disgorges an asset after having embezzled cash.

■ An embezzler who includes embezzlement income on his tax return is entitled to a deduction for reimbursing the victims in the year in which restitution is made.

*James v. United States*, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961); *Mais v. Commissioner*, 51 T.C. 494 (1968); Rev. Rul. 65–254; Section 165 (26 U.S.C.). Similarly, an embezzler who embezzles cash is entitled to a Section 165 deduction only to the extent that the victims are actually reimbursed. *James v. United States, supra; Yerkie v. Commissioner*, 67 T.C. 388 (1976). Therefore, determination of an asset's basis is unnecessary under Section 165 when the deduction is based solely upon a cash transaction.

The testimony at trial established that as a result of arms length sales of the enumerated disgorged assets, the Receive obtained a total of $296,435.85 for distribution to the defrauded investors. The IRS and previously allowed a $500,000 deduction for these assets, and Plaintiffs received credit therefrom.

Plaintiffs argue that the Receiver received substantially less for the disgorged properties than Plaintiffs had paid for them. Plaintiffs claim that the proper basis should be premised upon their costs of acquisition, not upon the amounts subsequently realized by the Receiver and reimbursed to the defrauded investors.

This Court cannot accept Plaintiffs' argument. The grounds for allowing an embezzler any deduction under § 165, is premised upon the *reimbursement* that the victims receive. The controlling premise is the repayment to the victims, not the value of any assets which the embezzler may have purchased with the embezzled funds. Any other conclusion would be inequitable. Otherwise, an embezzler could repay the entire amount of embezzled funds, and yet receive credit for amounts far exceeding the amount of the reimbursement, that directly resulted from the unlawful taking of those funds. This Court finds that this could not be the intention of the Courts in allowing such deductions because an embezzler could otherwise still profit from his illegal acts.

Therefore, Plaintiffs are not entitled to a refund of federal income taxes as a result of their amended joint 1981 income tax return. The correct amount of deduction in this case is the amount realized by the sale of the properties which were acquired with the embezzled funds—the amount actually reimbursed to the victims of GREENMAN's illegal scheme.

*D. "Innocent Spouse" Claim*

■ 26 U.S.C. § 6013(e) contains the "innocent spouse" provisions and provides in pertinent part:

(e) IN GENERAL—Under regulations prescribed by the Secretary, if:

(A) a joint return has been made under this section for a taxable year,

(B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse,

(C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and

(D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement, then the other spouse shall be relieved of liability for tax (including interest, penalties and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement.

Plaintiffs have the burden of establishing all four conditions for entitlement to innocent spouse relief under this section. *Allen v. Commissioner*, 514 F.2d 908 (5th Cir.1975); *Quinn v. Commissioner*, 62 T.C. 223 (1974). There is no dispute that Plaintiffs have satisfied the requirements of subsections (A) and (B) of the statute. The evidence presented at trial, however, as fully explored in this Court's Findings of Fact, established that JAYNE GREENMAN either knew or had reason to know that there was a substantial understatement on the original 1980 joint income tax return. Therefore, JAYNE GREENMAN, is not an "innocent spouse" and must be denied relief. *Sanders v. United States*, 509 F.2d 162 (5th Cir.1975); *Ratana v.*

*Commissioner*, 662 F.2d 220 (4th Cir.1981); *Estate of Jackson v. Commissioner*, 72 T.C. 356 (1979).

Accordingly, it is hereby

ORDERED AND ADJUDGED that this Court finds for the Defendant on all claims. The Defendant is ORDERED to submit a proposed final judgment to this Court within 15 days of the date of this Order.

DONE AND ORDERED.